THE STATE OF OHIO, APPELLEE, *v.* LOSEY, APPELLANT.

(No. 84AP-768—Decided June 25, 1985.)

*Michael Miller,* prosecuting attorney, and *Karen L. Martin,* for appellee.

*Thomas M. Tyack & Assoc. Co., L.P.A.,* and *Peter Collins, Jr.,* for appellant.

*Per Curiam.* Defendant-appellant, Michael Desmar Losey, was indicted on December 23, 1983, for aggravated burglary in violation of R.C. 2911.01 and involuntary manslaughter in violation of R.C. 2903.04(A). The defendant waived a jury and the case proceeded to trial before the court in which the defendant admitted the aggravated burglary but denied liability for the involuntary manslaughter.

Defendant testified that he approached a house located at 616 Whitethorne Avenue shortly after 11:00 p.m. on November 25, 1983; that he knocked at the front door and, upon receiving no response, forced open the door and proceeded to attempt to remove a bicycle. His friend, who had been waiting outside, yelled that a car was slowly approaching. The defendant then placed the bicycle beside the front door and departed, leaving the front door open behind him. James Harper, the owner of 616 Whitethorne Avenue, testified that he heard a noise at approx-

imately 1:00 a.m. Shortly thereafter, his mother, with whom he resided, appeared at his bedroom door inquiring about the noise. They proceeded together to the living room, whereupon they discovered the open front door and the bicycle standing near the door. James Harper stated that he then told his mother to go back to her bedroom while he went to check the rest of the house. After so checking, he returned to the living room and was calling the police when his mother appeared in the hallway looking very upset and then collapsed. He called an emergency squad, which had attempted to revive Mrs. Harper for almost an hour when the squadmen pronounced her dead. Prior to the burglary, Mrs. Harper had returned from bingo at approximately 10:00 p.m. that evening and had gone to bed. Based on these facts, the trial court found defendant guilty of aggravated burglary and involuntary manslaughter. Defendant appeals from the trial court's decision and asserts the following assignments of error:

"1. The judgment of the trial court was against the manifest weight of the evidence, and should be reversed.

"A. The trial court erred in finding that the defendant's actions were the proximate cause of death, and therefore, the judgment should be reversed.

"B. The trial court erred in finding guilt of the defendant based upon an impermissible inference on an inference, and therefore, the judgment should be reversed.

"2. The trial court erred in finding the defendant guilty of involuntary manslaughter pursuant to Section 2903.04, Ohio Revised Code, for the reason that the statute is unconstitutional on its face, and as specifically applied in this case, since it imposes criminal responsibility without proof of a culpable mental state on the part of the defendant. Therefore, the judgment should be reversed."

The thrust of defendant's first assignment of error is that Mrs. Harper's death was not the proximate result of his conduct.

As relevant to our inquiry, involuntary manslaughter at common law was an unexcused, unintentional homicide resulting from the commission of a criminal act not amounting to a felony nor naturally tending to cause death or great bodily harm. Clark & Marshall, Crimes (1952) 353-354, Section 262. Essentially, that common-law unlawful act manslaughter concept was carried forward in Ohio's statutory treatment of involuntary manslaughter until the adoption of the new criminal code in 1974.

When the new criminal code was introduced in the Ohio General Assembly, it included a reckless homicide provision as a substitute for the former statute which had punished conduct without reference to a specific culpable mental state. However, as the result of the legislative process, the reckless homicide provision was dropped in favor of a section retaining traditional unlawful act manslaughter concepts, in the form of the present involuntary manslaughter statute. Goldsmith, Involuntary Manslaughter: Review and Commentary on Ohio Law (1979), 40 Ohio St. L. J. 569. The language of R.C. 2903.04 follows:

"(A) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit a felony.

"(B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit a misdemeanor.

"* * *"

The result of the adoption of division (A) of the statute was a statute embodying a concept reminiscent of common-law felony murder. In addition, the General Assembly incorporated another form of felony murder into its definition

of aggravated murder, obviating the necessity of proving prior calculation and design, where the actor purposely kills another while committing one of a list of specified felonies, R.C. 2903.01(B). Thus, if the defendant, in the course of committing armed robbery, purposely, but without prior calculation and design, kills the hold-up victim, he is guilty of aggravated murder, but, if the killing is accidental, then, he is guilty of involuntary manslaughter.

Prior to the adoption of the new criminal code, Ohio case law limited the class of unlawful acts which could serve as a predicate for involuntary manslaughter to those crimes whose nature was such that death was to be a reasonably anticipated result of their commission, and further limited criminal responsibility for a death resulting from the commission of those crimes to those instances where the death was the natural, logical and proximate result of the defendant's commission of the crime. *Black* v. *State* (1921), 103 Ohio St. 434, paragraph one of the syllabus. Whether or not the first limitation survived the 1974 recodification and restricts the types of felonies which may serve as a predicate for involuntary manslaughter, is not at issue here since burglary is clearly such a felony. The second limitation, that the death must be the proximate result of the defendant's conduct in committing the crime, clearly survived in the language of R.C. 2903.04.

The term "proximate result" was used by the General Assembly to refine and limit the verb "cause." Thus, it is conceivable that defendant's conduct may have caused Mrs. Harper's death in the sense that he set in motion events which culminated in her death, which therefore would not have occurred in the absence of that conduct, but, nevertheless, that the death was not the proximate result of his conduct if it were not

the natural, logical, and foreseeable result of his conduct. Under the statute, defendant cannot be held responsible for consequences no reasonable person could expect to follow from his conduct; he will be held responsible for consequences which are direct, normal, and reasonably inevitable — as opposed to extraordinary or surprising — when viewed in the light of ordinary experience. In this sense, then, "proximate result" bears a resemblance to the concept of "proximate cause" in that defendant will be held responsible for those foreseeable consequences which are known to be, or should be known to be, within the scope of the risk created by his conduct. *State* v. *Chambers* (1977), 53 Ohio App. 2d 266 [7 O.O.3d 326]. Here, that means that death reasonably could be anticipated by an ordinarily prudent person as likely to result under these or similar circumstances. See *State* v. *Nosis* (1969), 22 Ohio App. 2d 16 [51 O.O.2d 15].

Consequences which are reasonably foreseeable from a burglary were aptly summarized by the Court of Appeals for Lorain County in its opinion in *State* v. *Chambers, supra,* at 270-271:

"We conceive few dangers, faced by the law-abiding public, to be more extreme than the unlawful entrance of one person into a residence occupied by another. The risk of actual serious physical harm to a victim or wrongdoer, the threat of surprise of one by the other, the natural inclination of the victim, if present, to protect and defend his abode and his family are all factors too clear to discuss further. To imagine that the risk of physical harm is not foreseeable under the circumstances surrounding this case defies not only logic but also the characteristics of the human animal. * * *"

The evidence in this case does not describe a situation where the deceased was the victim of physical violence, or of fright or shock, resulting from a direct

physical confrontation with a burglar. According to the evidence, Mrs. Harper heard a noice in the night and followed her son downstairs where he discovered that a door had been pried open.

The deputy coroner testified that, due to her existing condition, Mrs. Harper was a "prime candidate" to have a heart attack and that "[i]t would be more probable that an insult would have lethal consequence because of the already damaged heart." A hypothetical question posed to the deputy coroner by the prosecutor includes these facts:

"Q. * * * Doctor, * * * Hypothesize a 69-year-old woman who had severe generalized atherosclerosis to the head, brain, lower extremities, and a mild case of cardiomegaly. She also has arterionephrosclerosis and has had three prior heart attacks in 1970, 1971, and in 1982.

"She also has pleuritis and focal dense pulmonary lumphocytic infiltrate as well as a very high blood pressure.

"Due to the atherosclerosis, she also has angina pectoris, and she has severe diabetes mellitus.

"She would, however, normally stay away from things that upset her. On November the 25th, 1983 [the night of the incident], this woman played bingo, which her physician advised her against doing but which she had been doing for approximately 20 years.

"At approximately one o'clock in the morning * * * her son heard a noise in the living room * * *. His mother came to his room. They both went to investigate the noise.

"Upon reaching the living room, both noticed that the front door was open and that a bicycle had been moved. Neither ever saw any intruder.

"The woman went to her bedroom, returned to the living room, became very excited, and while her son was calling the police, collapsed on the living room floor by the hallway. * * *

"In the course of performing an autopsy on this person, there were some thrombi found near the area of the right ventricle in the artery.

"Doctor, based upon the foregoing, do you have an opinion to a reasonable medical certainty as to the cause of that coronary thrombosis?

"* * *

"A. Yes, sir, I do.

"Q. Would you state your opinion, please?

"A. She died of an acute coronary thrombosis and that it was precipitated by the emotion."

The doctor's testimony established that defendant's conduct was a cause of Mrs. Harper's death in the sense that it set in motion events which culminated in her death. However, it still must be determined whether defendant was legally responsible for her death — whether the death was the proximate result of his conduct. It is not necessary that the accused be in a position to foresee the precise consequence of his conduct; only that the consequence be foreseeable in the sense that what actually transpired was natural and logical in that it was within the scope of the risk created by his conduct. That concept is well-illustrated by the facts of State v. Chambers, supra, where the defendant and a confederate broke into a residence, were confronted by the armed resident and, in the melee which ensued, defendant's confederate was mortally wounded by the resident. Determining that the companion's death was a foreseeable consequence of defendant's conduct, the court of appeals upheld his conviction for involuntary manslaughter.

By the same token, in this case, the causal relationship between defendant's criminal conduct and Mrs. Harper's death was not too improbable, remote, or speculative to form a basis for criminal responsibility. Although defendant did not engage in loud or violent conduct calculated to frighten or shock,

his presence was nevertheless detected by Mrs. Harper.

There are numerous reported cases where criminal responsiblity has attached to a death resulting from fright or shock where the defendant's criminal conduct was witnessed by the victim. See Annotation (1956), 47 A.L.R. 2d 1072, 1074, Section 3, and supplements. Most of those cases involved situations where the victim's health was fragile, even though the accused might not have been aware of that fact.

Although, in the context of a death precipitated by fright or shock attending the apparent commission of a burglary, we would be hesitant to stretch the concept of proximate result, with its component requirement of foreseeable consequences, to encompass a death resulting from events not triggered by contact or close contemporaneous physical proximity involving the accused and his victim, in this case, defendant and the victim were in the same house at the same time and the victim's fright was initially precipitated by her detection of defendant's presence.

Defendant also argues that the trial court's decision was impermissibly based upon an inference on an inference. This contention is not well-taken. There was direct evidence of Mrs. Harper's emotion. Her son testified that she was very upset upon discovering the burglary and that he had never seen her that upset. The cause of death, coronary thrombosis, was established by the direct evidence of the deputy coroner's testimony and the autopsy report. The only inference involved is whether the emotion caused the thrombosis. The coroner stated his opinion that, to a reasonable medical certainty, the emotion of discovering the burglary caused the attack. Dr. Murnane testified that stress could have caused the attack and would have done so within minutes of the stress.

The first assignment of error is overruled.

The second assignment of error is not well-taken. Defendant cites no authority for the proposition that the traditional rule of law, that criminal intent as an element of felony murder and involuntary manslaughter is supplied by the criminal intent to do the underlying unlawful act of which the homicide is a consequence, is unconstitutional.

In rejecting the concept of reckless homicide and opting instead to retain unlawful act manslaughter in R.C. 2903.04, the General Assembly manifested its purpose to adopt the traditional concept of transferred intent in the instance of involuntary manslaughter. In doing so, the General Assembly specified the "degree of culpability" alluded to in R.C. 2901.21(B).

The assignments of error are overruled, and the judgment of the trial court is affirmed.

*Judgment affirmed.*

MOYER, NORRIS and STERN, JJ., concur.

STERN, J., retired Justice of the Supreme Court of Ohio, assigned to active duty pursuant to Section 6(C), Article IV, Ohio Constitution.