The STATE of Ohio, Appellee,

v.

LOVELACE, Appellant.

[Cite as *State v. Lovelace* (1999), 137 Ohio App.3d 206.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–990063.

Decided Dec. 17, 1999.

---

208

*Michael K. Allen,* Hamilton County Prosecuting Attorney, and *Ronald W. Springman,* Assistant Prosecuting Attorney, for appellee.

*Kenneth L. Lawson,* for appellant.

---

GORMAN, Judge.

The issue in this appeal is whether a person who leads police on a high-speed car chase can be found guilty of involuntary manslaughter when one of the police cruisers in pursuit runs a stop sign and collides with another vehicle, killing the driver. The answer turns on whether the evidence was sufficient to support the jury's finding that the defendant-appellant, Paul Wayne Lovelace, should have foreseen the fatal accident as a consequence of his own reckless behavior. At the time of the accident, Lovelace was driving a stolen car and had already led Ohio and Kentucky police on a multi-car chase that reached speeds of one hundred miles per hour, crossed back and forth over the Ohio River, and caused several collisions and near collisions in both states.

Lovelace argues that he cannot be guilty of involuntary manslaughter because he could not possibly have foreseen that the officer would disregard the stop sign—although he had done so himself only moments before. In his view, the police officer's failure to stop was an intervening cause of the accident, absolving him of criminal responsibility. Lovelace also contends that his trial was unfair because the trial court's evidentiary rulings deprived him of the opportunity to present crucial evidence, and because the jury instructions misled the jury on the critical issue of proximate cause.

Finding no merit in any of these arguments, we affirm.

## The Chase

On May 31, 1997, Todd Eggleston reported his 1989 blue Pontiac Grand Am stolen from the parking lot of a Wal–Mart store located in Western Hills. On June 4, 1997, a Cincinnati police officer and a police recruit traveling in a cruiser at 1 a.m. in Clifton spotted the Grand Am, which was on a "hot sheet" of stolen vehicles. Together with additional officers called to the scene, the police officer and the recruit approached the vehicle as it waited for a red light at the intersection of Ravine, McMillan, and Fairview. Lovelace was at the wheel and was ordered to put his hands up. According to one of the officers, Lovelace "smirked" and then put the car in drive. Lovelace then drove onto the sidewalk and proceeded to lead the police on a seventy-mile-per-hour car chase in which he ran several red lights and almost struck another car broadside. The chase ended

when the officer in pursuit received a radio broadcast from his captain telling him to desist.

On June 15, 1997, in a high-drug-activity area near Clifton, police officers Franklin Correll and Robert Hill observed the Grand Am, with Lovelace driving, and became suspicious of its presence in the neighborhood. They followed the vehicle in their cruiser and eventually observed the Grand Am make a right turn onto Vine Street in front of two other vehicles. After further observing the car run a red light to make another right turn onto McMillan, the officers switched on their overhead "wig-wag" lights. When the "wig-wag" lights produced no effect, the officers momentarily activated the siren. Lovelace first feigned that he was going to pull over, then suddenly accelerated. Lovelace headed down East McMillan Avenue toward the I–71 ramp near Gilbert Avenue.

Lovelace eventually had no choice but to stop behind traffic backed up at a red light. The two officers pulled their cruiser behind the Grand Am, blocking it, then exited from the cruiser and approached the Grand Am on foot. Officer Hill was ordering Lovelace to turn off the ignition when he noticed the reverse lights of the Grand Am suddenly come on. Convinced that he was about to be deliberately run over, Officer Hill drew his revolver and aimed it at Lovelace through the rear window. Officer Hill testified that he was "looking for a reason not to fire" when the reverse lights went off and Lovelace shot forward, slamming into the vehicle in front of him in order to push it out of the way.

Another high-speed chase began. The officers estimated their speed at between seventy-five and eighty miles per hour as they followed Lovelace down Gilbert, onto I–71 south along Ft. Washington Way, and then off at the Vine Street exit, where Lovelace raced toward Covington, Kentucky, across the Suspension Bridge. Asked to describe Lovelace's "driving behavior" during this time, Officer Hill responded, "I am trying to think of a good word, other than dangerous. It seemed to me like he wanted to get away *at any cost.*"

Pursuant to a policy of not pursuing vehicles into Kentucky "except for serious felonies," the two officers halted their pursuit just over the bridge and returned to the District 1 police station on Ezzard Charles Drive.

The chase, continued, however, across the river when Wilder Police Officer Anthony Rouse responded to a radio dispatch that Lovelace was in Newport and headed toward Wilder on Route 9. Taking Route 9 in the direction of Newport, Officer Rouse soon saw Lovelace's vehicle approaching him at a speed that he clocked on radar at ninety-seven miles per hour. Pulling off the road for his own safety, Officer Rouse waited for Lovelace to go past and then turned around and began chasing him. Officer Rouse testified that Lovelace nearly wrecked in a construction zone, ran a stop sign, and almost collided with a truck while passing another vehicle. The truck was forced to skid off the road.

Officer Rouse followed Lovelace onto I–275. Lovelace was heading westbound toward the Greater Northern Kentucky Airport at speeds ranging between seventy-five and one hundred miles per hour. Two Taylor Mill police officers in separate cruisers joined the pursuit. At the junction of I–275 and I–75, Lovelace turned north, back toward Cincinnati. According to the officers, Lovelace was zigzagging through traffic at speeds hovering around one hundred miles per hour when he made a sudden turn off the Buttermilk Pike exit, skidded into the intersection at the bottom of the ramp, and then quickly got right back on I–75 north. The officers testified that Lovelace was travelling in the emergency lane at speeds in excess of ninety miles per hour.

Only one of the officers, Officer Reis from Taylor Mill, was able to keep close enough to Lovelace to maintain pursuit into Ohio across the Brent Spence Bridge. Once over the Ohio River, Lovelace took the River Road–Linn Street exit and then sped between eighty and ninety miles per hour in a westerly direction on River Road, toward Police District 3.

At this point, the two District 1 officers, Officers Correll and Hill, who had earlier chased Lovelace over the Suspension Bridge, heard over the police radio that the chase had returned to Cincinnati. The officers returned to their cruiser and were headed toward River Road when their supervisor advised them over the radio not to pursue into District 3.

Meanwhile, Cincinnati Officer Gregory Berting, who was working out of District 3, learned of the chase over the radio while at a restaurant with his sergeant and another officer. Officer Berting decided to respond to the broadcast with the approval of his sergeant. He drove west down River Road in what he thought was the direction of the chase, but then turned back toward downtown when he failed to make visual contact.

In the interim, Officers Correll and Hill learned from the radio dispatcher that the chase was returning to the downtown area, via the Mehring Way exit. They moved in the direction of the exit, heading east toward Cinergy Field.

While all this was happening, Taylor Mill police officer Reis was doggedly pursuing Lovelace as he reentered the downtown area along the riverfront. He followed Lovelace along Mehring Way until it entered an industrial area of small cobblestone side streets intersected by railroad tracks. He testified that even Lovelace was forced to slow down to speeds of forty to sixty miles per hour given the road conditions. When the chase crossed the intersection of Central and Produce, Officer Reis testified, both he and Lovelace slowed. Neither, however, obeyed the two stop signs, one grounded and one elevated, requiring the traffic on Produce to stop.

Meanwhile, as Officer Berting headed toward downtown, he, like Officers Correll and Hill, learned from the dispatcher that the pursuit was on Mehring Way, approximately one-quarter to one-half mile away from his current location. Officer Berting therefore turned onto Mehring Way by Longworth Hall and saw a police car with its lights flashing. He then witnessed the pursuit heading toward the intersection of Central and Produce. At this point events turned tragic.

Eighteen-year-old Michael Tenhundfeld, together with his girlfriend, Petrina Dixon, and another female friend, Lisa Carter, had just finished working at a Cincinnati Reds baseball game at Cinergy Field and were driving home in Tenhundfeld's Honda Prelude. Tenhundfeld, with Dixon in the front seat, turned northbound on Central Avenue. Just as the Prelude crossed Produce, Officer Berting's cruiser ran the two stop signs. Although Officer Berting braked as the Prelude entered his field of vision, the cruiser skidded into the intersection and struck the side door of the Prelude, killing Tenhundfeld instantly.

Subsequent accident reconstruction by the state's experts established Officer Berting's speed as he ran the stop signs at sixty-five miles per hour. Tenhundfeld's speed was estimated to be in the range of twenty to thirty-three miles per hour.

As fire and rescue units responded to the accident, Lovelace continued to elude capture. Officer Reis, who was unaware of the accident, followed Lovelace across Third Street and into the main part of the downtown area. Lovelace ignored the red lights. He struck a car in an intersection on Fourth Street, and then struck a parked car before racing back to Third Street and turning left in front of the police station in order to gain access to Columbia Parkway.

Officer Reis realized at this point that the pursuit had become simply too dangerous to warrant its continuation. He testified, "He [Lovelace] has presented an extremely, I mean, he appeared to me he wasn't going to stop for anything or anybody and that, I felt that if I continued on he would eventually kill somebody with his driving."

Then, however, Officer Reis's persistence paid off. As he slowed down, ready to end the pursuit, he observed Lovelace exit from Columbia Parkway onto Eastern Avenue. Officer Reis then saw the Grand Am slow down and Lovelace jump out and vault the guardrail, trying to run into the woods. Reis left his cruiser and chased down Lovelace, tackling him and placing him in handcuffs.[1]

---

1. Lovelace later made a statement to the police in which he claimed that a drug dealer named "Dog" had provided him with the Grand Am. He also stated that on the day of the fatal car chase he had taken three "hits" from a crack cocaine pipe.

### The Aftermath

When they approached Produce off of Mehring Way, Officers Correll and Hill observed the scene of the accident that killed Tenhundfeld. Officer Berting was out of his cruiser, which was smoking with its lights and siren still on, and was attempting to reach into the Prelude to feel Tenhundfeld's body for a pulse. According to Officer Correll, it was obvious that Tenhundfeld was already dead. He presumed that the lone female passenger still in the backseat of the vehicle, who was lying motionless, was dead as well. Petrina Dixon, the other passenger, was standing outside of the vehicle, apparently not seriously harmed. Officer Hill described Dixon's face as "just in utter complete shock."

Officer Berting was subsequently dismissed from the Cincinnati police force and charged with negligent vehicular homicide, a misdemeanor, for his role in Tenhundfeld's death. Waiving his Fifth Amendment rights at trial, he testified that he could not remember seeing the stop signs at the intersection of Produce and Central. In response to the question why he suddenly hit his brakes, however, he stated, "I would assume it was a stop sign."

Officer Berting was further asked what his "intention" was when he started across Central. He responded, "I guess the theory is that—I'm trying to put in it simplest terms, trying to catch the bad guy." On cross-examination, Officer Berting agreed that he "knew better" than to go through a stop sign at sixty miles per hour without looking for oncoming traffic, even during a pursuit. He insisted, however, that he was trying to stop his vehicle before seeing Tenhundfeld's car.

### Eyewitnesses and Experts

Christina McElroy and her friend, Dan Sherman, were riding bicycles along the riverfront, forty feet from the intersection of Central and Produce, when Lovelace's vehicle approached from the west. McElroy testified that Lovelace's car failed to stop at Central Avenue and was travelling at a speed between forty-five and fifty-five miles per hour. Within ten seconds, she testified, a police cruiser appeared from the same direction in pursuit. She testified that she then spotted a second police cruiser passing by in the same direction, followed shortly by a third—Officer Berting's vehicle. She estimated the time between the first appearance of Lovelace's vehicle and Officer Berting's cruiser as thirty seconds.

Dan Sherman corroborated McElroy's testimony, although he did not see the second police cruiser. He estimated the time lapse between the appearance of the Grand Am and Officer Berting's cruiser at 45 seconds. He testified further that Officer Berting "was probably entering the intersection when he first tried to hit the brakes."

Charles R. Beebe, a police specialist assigned to the Cincinnati police traffic unit that investigated the accident, estimated Officer Berting's speed at the point that he perceived the Prelude as sixty-five miles per hour, and at the point of impact at fifty miles per hour. Both Beebe and another accident investigator, Sergeant Steven Eggers of the Cincinnati Police, expressed the view that Officer Berting's skid marks indicated that he applied the brakes before being able to see the Prelude, but they were not able to say what it was that might have caused him to brake earlier. Both experts agreed that Officer Berting did not stop before entering the intersection.

## Foreseeability and Proximate Cause

In his first assignment of error, Lovelace challenges his conviction for involuntary manslaughter as based upon insufficient evidence and contrary to the weight of the evidence. The crux of his argument is that the state failed to produce evidence to prove that the accident that killed Tenhundfeld was the direct, proximate result of his refusal to comply with an order to stop. We disagree.

As defined in R.C. 2903.04(A), involuntary manslaughter is committed when another person dies as the "proximate result of the offender's committing or attempting to commit a felony." The underlying felony in this case was predicated upon R.C. 2921.331(B), which prohibits a person from operating a motor vehicle "so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring his motor vehicle to a stop." A violation of this section is a felony when it is the proximate cause of serious physical harm to persons or property. R.C. 2921.331(C)(2).

The state and Lovelace recognize *State v. Chambers* (1977), 53 Ohio App.2d 266, 7 O.O.3d 326, 373 N.E.2d 393, as the leading case interpreting the element of proximate cause in the involuntary manslaughter statute. According to the court in *Chambers*, the element is satisfied when the accused sets in motion a sequence of events that make the death of another a "direct, proximate, and reasonably inevitable" consequence.

Applying the test in *Chambers*, Ohio appellate courts have upheld involuntary-manslaughter convictions in any number of unique factual scenarios. In *State v. Losey* (1985), 23 Ohio App.3d 93, 23 OBR 158, 491 N.E.2d 379, for example, the defendant's conviction was affirmed where a homeowner suffered a fatal heart attack after awakening to find that her residence was being burglarized. In *State v. Williams* (1990), 67 Ohio App.3d 677, 588 N.E.2d 180, the court affirmed the defendant's conviction based upon his participation in an unruly mob that beat a person senseless and then left him lying in the street to be later run over and killed by a passing automobile.

Compared to the facts of these cases, the state argues, the causal relationship between Lovelace's failure to stop and Tenhundfeld's death was even more direct and foreseeable. Lovelace argues, however, that Tenhunfeld was killed not as the direct and proximate result of the high-speed chase that he instigated, but, rather, because Officer Berting, who was not in direct pursuit of Lovelace's vehicle, raced through a stop sign in utter disregard for the safety of the public. According to Lovelace, Officer Berting's running of the stop sign governing the intersection of Central and Produce was an unforeseeable, intervening cause that absolved him of criminal responsibility for Tenhundfeld's death.

Lovelace relies upon the decision of the Lucas County Court of Appeals in *State v. Hamrick* (Dec. 19, 1997), Lucas App. No. L–96–059, unreported, 1997 WL 796455, reversing the defendant's conviction for involuntary manslaughter as a result of a high-speed pursuit. In *Hamrick,* the victim's death occurred when a police cruiser, instead of taking the same street as the vehicle being chased, took another street and ran a red light, striking a civilian vehicle and killing a nine-year-old passenger. The Lucas County Court of Appeals concluded that the defendant was not criminally responsible, as a matter of law, because the cruiser's failure to yield the right of way was "an intervening act of a third person for which that person may be liable," and because it was not within the defendant's power to "foresee that a unit on the periphery of the pursuit would disobey multiple department engagement rules and state law on emergency vehicle right of way."

■ "[I]t is the very essence of our deep-rooted notions of criminal liability that guilt be personal and individual." Sayre, Criminal Responsibility for the Acts of Another (1930), 43 Harv.L.Rev. 689, 716. Generally, for a criminal defendant's conduct to be the proximate cause of a certain result, it must first be determined that the conduct was the cause in fact of the result, meaning that the result would not have occurred "but for" the conduct. Second, when the result varied from the harmed intended or hazarded, it must be determined that the result achieved was not so extraordinary or surprising that it would be simply unfair to hold the defendant criminally responsible for something so unforeseeable. LaFave & Scott, Criminal Law (1972), Section 35, 246.[2]

---

2. It should be noted that police-pursuit cases have been used in law school textbooks to illustrate the difficult issues that arise in determining criminal causation. See Dix & Sharlot, Criminal Law, Cases and Materials (2 Ed.1979), 362–365, discussing *People v. Scott* (1971), 29 Mich.App. 549, 185 N.W.2d 576. The difficulty is compounded because the principles governing causation for purposes of criminal liability are generally neither codified nor stated collectively "as a coherent body of doctrine." Weinreb, Comment on Basis of Criminal Liability; Culpability; Causation, in 1 Working Papers of the National Commission on Reform of Federal Criminal Laws (1970), 142–143.

Obviously, under the test of causation in fact, the death of Michael Tenhundfeld would never have occurred that evening if Lovelace had not led the police on an incredibly reckless high-speed chase. *But for* the police chase that Lovelace created by his failure to stop, Officer Berting would have finished eating with his sergeant and never been racing through the intersection at Central Avenue and Produce at the same time Tenhundfeld was approaching from the opposite direction.

The next question is twofold: (1) was there sufficient evidence to go to the jury on the question of proximate cause, i.e., whether the accident was foreseeable to Lovelace, and (2) if so, was the finding by the jury that the accident was foreseeable contrary to the weight of the evidence?

The test for sufficiency requires only that there be some evidence, viewed in the light most favorable to the prosecution, from which a reasonable trier of fact could have found the elements of the crime beyond a reasonable doubt. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 390–391, 678 N.E.2d 541, 549. Questions of causation are generally held to be matters for the jury, and are seldom thought to be determinable as matter of law. "[There is] no bright line demarcating a legally sufficient proximate cause from one that is too remote." *People v. Roberts* (1992), 2 Cal.4th 271, 320, 6 Cal.Rptr.2d 276, 302, 826 P.2d 274, 300, fn. 11.

We hold that there was sufficient evidence in this case to go to the jury on the issue of foreseeability. We are not persuaded by the holding of *Hamrick* that it is unforeseeable, as a matter of law, that, in the highly charged atmosphere of a high-speed chase, a police officer may disregard the safety of others and speed through an intersection in order to catch up with the vehicle being pursued. Certainly in a perfect world such errors of judgment would not happen. But the fact is they do. It is difficult to believe, furthermore, that Lovelace could not foresee that one or more of the officers chasing him would be so caught up in the chase that they would become reckless in their attempt to catch up to him. As stated by one court on similar facts:

"Defendant's grossly negligent acts consisted of his seeking to elude the pursuing law enforcement officers by charging through traffic at extremely high speeds. Had defendant stopped as he should have, the accident would not have occurred. Instead, his persistent attempt to escape brought about just what would be expected: pursuit by more officers. The speeds, places, conditions and methods of driving were primarily dictated by the defendant; he chose the route and speeds. Predictably, the officers chose to follow suit, keep him in view and apprehend him when he stopped or was stopped. The probability that this might result in one or both of the officers losing control and/or colliding with another

vehicle or some object is sufficient to establish that defendant's conduct was a cause that, in natural and continuous sequence, produced [the victim's] death and without which that death would not have occurred." *People v. Pike* (1988), 197 Cal.App.3d 732, 749–750, 243 Cal.Rptr. 54, 65.[3]

Nor do we agree with Lovelace, relying again on *Hamrick*, that the accident that killed Tenhundfeld was unforeseeable because Officer Berting was somehow not involved in the actual pursuit. Granted, Officer Berting's was never the lead car, nor was it, perhaps, even the secondary car. It is wrong to suggest, though, that Officer Berting, like Officers Correll and Hill, was not in pursuit of Lovelace at the time of the accident. He was, like Officers Hill and Correll, tracking the chase on the radio and attempting to catch up with it. According to Officer Berting, he actually made visual contact with the chase before he entered the intersection of Central and Produce. The two witnesses put him at only thirty to forty-five seconds behind Officer Reis and Lovelace going through the intersection. Unlike the police cruiser in *Hamrick*, moreover, Officer Berting's was not attempting some shortcut—it was, rather, following directly in the path of Lovelace and Officer Reis.

Finally, we must address Lovelace's argument that the accident was unforeseeable because Officer Berting violated departmental policy. Although denied certain lines of inquiry,[4] Lovelace's attorney was able to establish repeatedly through cross-examination of the other pursuing officers that their training required them not to unreasonably jeopardize public safety in a pursuit. Officer Reis testified, in fact, that even though his was the lead chase car, he nonetheless slowed (as, in fact, did Lovelace) when he crossed the intersection of Central and Produce. Officer Berting testified that he "knew better" than to run a stop sign, even while in pursuit.[5] Furthermore, the jury was informed that Officer Berting had been dismissed from the police force and had been charged with negligent vehicular homicide for his role in the accident, clearly indicating that his actions

---

**3.** See, also, *People v. Harris* (1975), 52 Cal.App.3d 419, 125 Cal.Rptr. 40, in which the defendant fled from the police on a motorcycle for ten miles at speeds approaching one hundred miles per hour. Concerning the issue of proximate cause, the *Harris* court stated, "It was reasonably foreseeable that the officers would continue to chase [the defendant] as he speeded recklessly and circuitously over public thoroughfares and failed to stop at boulevard stops, thus setting in motion circumstances creating peril to others on the public streets and a high probability that collisions, injuries and deaths would occur in the course of the chase." *Id.* at 427, 125 Cal.Rptr. at 46.

**4.** See the discussion of Lovelace's second, third, fourth, and sixth assignments of error *infra*.

**5.** Officer Berting was asked upon cross-examination, "When your are trying to catch up to a pursuit [*sic*], you know better than to try to go through a stop sign at 60 miles an hour, without looking for oncoming traffic, don't you, Officer Berting?" He replied, "Yes, sir."

were deemed not only improper by his superiors but criminal by the Hamilton County Prosecutor.

The issue is whether any of this evidence made it reasonably unforeseeable, as a matter of law, that Officer Berting would have acted as he did. We hold that it did not. Evidence that a police officer involved in a high-speed pursuit violated departmental policy goes primarily to the reasonableness of the officer's conduct. The test of proximate cause, however, is not whether Officer Berting's response was reasonable, but, rather, whether it was reasonably *foreseeable*. *People v. Schmies* (1996), 44 Cal.App.4th 38, 51 Cal.Rptr.2d 185. Simply because a person's conduct is unreasonable or even criminal does not make it unforeseeable.[6] Indeed, as the court in *Schmies* pointed out, evidence that an officer acted contrary to training and policy is a double-edged sword since such training and policy are implemented "precisely because vehicular pursuit of lawbreakers by officers and the resulting danger to users of the roads are so foreseeable." *Id.* at 54, 51 Cal.Rptr.2d at 195.

■ Finally, unless there is some basis in the record to conclude that Lovelace was aware of the officer's training and the departmental pursuit policies, it cannot be credibly argued that these matters had any bearing upon what was foreseeable to Lovelace at the time of the accident. *Id.* The question of foreseeability is determined from the perspective of what the defendant knew, or should have known, *"when viewed in the light of ordinary experience."* (Emphasis added.) *Losey, supra,* at 95, 23 OBR at 160, 491 N.E.2d at 382. There is nothing in the record to even remotely suggest that people of ordinary experience are conversant in police pursuit policy.[7] What was foreseeable, therefore, to some hypothetical person unusually knowledgeable in such matters was irrelevant to the inquiry of what was foreseeable to Lovelace.

■ It should be emphasized that for something to be foreseeable does not mean that it be actually envisioned. As stated by the court in *Losey,* "It is not necessary that the accused [be] in a position to foresee the precise consequence of his conduct; only that the consequence be foreseeable in the sense that what

---

6. "It is not necessary that an act which is done by the person harmed or by a third party be 'reasonable' [in order to be foreseeable] * * *. It is enough that the act is a normal consequence of the situation created by the actor's negligence." Restatement of the Law 2d, Torts (1965) 472, Section 443, Comment *a.*

7. Realizing this weakness in his position, Lovelace's attorney attempted to argue that Lovelace was, in fact, knowledgeable of police pursuit policy because, after the chase on June 4, 1997, he learned "enough about the policy to know eventually that you are going to stop chasing me." Suffice it to say, we are not convinced by this argument that Lovelace was in a real sense knowledgeable about the rules and policies governing the police in emergency and pursuit situations.

actually transpired was natural and logical in that it was within the scope of the risk created by his conduct." *Id.* at 96, 23 OBR at 161, 491 N.E.2d at 383.

We hold that a rational trier of fact could have concluded that the accident that killed Tenhundfeld was within the scope of the risk created by Lovelace as he led the police on an extremely reckless, extremely dangerous car chase. As noted by the court in *Pike,* inherent in car chases of this sort is the probability that one or more of the officers in pursuit will lose control of his vehicle and collide with another vehicle. That is not to say that it happens in every car chase, but when it does, it cannot be considered surprising or extraordinary.

■ We turn next to the other issue Lovelace raises under his first assignment—whether the jury's finding that his failure to stop proximately caused the accident was contrary to the weight of the evidence. In reviewing a verdict challenged as contrary to the weight of the evidence, this court may disagree with the jury's resolution of facts, but only if we can conclude that it lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *Thompkins, supra,* at 387, 678 N.E.2d at 547. The power to reverse a conviction and grant a new trial is discretionary and "should be exercised only in the exceptional case in which the evidence *weighs heavily against the conviction.*" (Emphasis added.) *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720–721.

This case is unique in that it did not present many disputes of fact. The crucial issue was that of foreseeability. As noted, there is no bright line; consequently, causal issues are normally left to the collective wisdom of the jury. Having already held that there was no impediment in law to the jury's finding that the accident was a foreseeable consequence of the car chase, we are left to determine only if the jury lost its way in reaching this conclusion. We hold that it did not. When a person chooses to engage in grossly reckless conduct by leading police on a high-speed car chase, crashing into cars and forcing others off the road to avoid capture at any cost, it is highly foreseeable that police will react by driving dangerously to keep up. It is also foreseeable that one or more of the officers will, despite training to the contrary, forget safety and go through a stop sign at high speed in order to gain ground. When this happens, lives are threatened. In sum, we do not find this to be the exceptional case in which the evidence weighs heavily against conviction.

Lovelace's first assignment of error is, therefore, overruled.

## Jury Instructions

In his second assignment of error, Lovelace argues that the trial court improperly instructed the jury on proximate cause. Specifically, Lovelace challenges the following language in the trial court's instructions:

"The fact that Officer Berting may have shared responsibility or fault for the accident does not in and of itself exonerate the Defendant for his role. In other words, whether Officer Berting's conduct was negligent, careless, tortious, cause for discipline or even criminal in any action against him is not an issue with respect to the Defendant here in this case.

"* * *

"In order to exonerate the Defendant, Officer Berting's conduct must be more than unreasonable, and must be sufficiently extraordinary as to be unforeseeable by a reasonably prudent person under the circumstances. It is not a defense to a criminal charge that the deceased or some other person was guilty of negligence, which was a contributory cause of the death or injuries involved in this case."

According to Lovelace, these instructions were in error, and prejudicial, because they told the jury that it could not consider the reckless, potentially criminal nature of Officer Berting's conduct.

The genesis of the excerpted language, as the trial court acknowledged, is the *Schmies* case, *supra*, in which the California court of appeals approved the trial court's decision to preclude evidence challenging the "reasonableness" of the officers' conduct in light of departmental guidelines. The *Schmies* court ob-served that there were two different contexts in which the "reasonableness" of the officers' conduct might arise. In the first, the officers would themselves be subject to a tort action, a disciplinary hearing, or even a criminal action. In this context—in which the reasonableness or propriety of the officers' conduct was on trial—the factfinder would necessarily have to consider whether they abided by departmental rules and policies. *Schmies, supra*, at 51, 51 Cal.Rptr.2d at 193.

In the second context, in which a civilian defendant's conduct was on trial, the *Schmies* court concluded that the "reasonableness" of the officers' conduct, for purposes of determining the defendant's blameworthiness, was irrelevant. As the *Schmies* court stated:

"[W]e reiterate, the negligence or other fault of the officers is not a defense to the charge against the defendant. The fact that the officers may have shared responsibility or fault for the accident does nothing to exonerate defendant for his role. In short, whether the officers' conduct could be described with such labels as negligent, careless, tortious, cause for discipline, or even criminal, in an action against them, is not at issue with respect to the defendant here. In this sense the 'reasonableness' of the officers' conduct, focused upon their point of view and their blameworthiness for the death, is not relevant.

"* * *

"[W]hether the officers violated the [California Highway Patrol] pursuit guidelines is immaterial. * * * The test, as we have recounted, is not whether the

officers acted unreasonably but rather whether the defendant realized or should have realized that the officers would respond as they did." *Id.* at 50, 51 Cal.Rptr.2d at 192.

We agree with the analysis in *Schmies*. Any detailed examination of whether Officer Berting acted reasonably, or even criminally, would have been a detour from the real question at issue: whether Lovelace realized—or, based on ordinary experience, should have realized—the likelihood that Officer Berting would respond as he did.

We must determine, however, whether, when read in context, the instructions incorporating the analysis were somehow inadequate, misleading or prejudicial to Lovelace. *State v. Lewis* (1993), 67 Ohio St.3d 200, 616 N.E.2d 921; *State v. McMillian* (May 8, 1996), Hamilton App. No. C–950523, unreported, 1996 WL 233866.

The above excerpt was part of a larger body of instructions that the trial court gave on foreseeability and proximate cause. These instructions, taken largely from the standard Ohio Jury Instructions, correctly instructed the jury that Lovelace was responsible only for the "natural, logical, and foreseeable results" of his unlawful act. The jury was also correctly instructed that "an intervening act may be so disconnected and unforeseeable as to be a superseding intervening cause," and that, in such case, Lovelace was not to be regarded as the cause of the injuries sustained. The following instruction was also given:

"If you find that Officer Berting's conduct was in direct and specific response to the defendant's alleged conduct, the claim that Officer Berting's conduct was a superseding intervening cause of the accident relieving defendant of any criminal liability for the accident can only be supported if you find the conduct of Officer Berting was so unusual, abnormal or extraordinary that it could not have been reasonably foreseen to have been a proximate result of the defendant's conduct by a reasonably prudent person under the circumstances.

"In order to exonerate the defendant, Officer Berting's conduct must be more than unreasonable, it must be sufficiently extraordinary as to be unforeseeable by a reasonably prudent person under the circumstances."

In light of these instructions, the only potential source of confusion we perceive was the trial court's use of the artificial construct "a reasonably prudent person under the circumstances." We emphasize that foreseeability in involuntary manslaughter is to be determined from the defendant's perspective. The use of the tort paradigm of the "reasonably prudent person" can be confusing in this context. It is difficult to imagine a reasonably prudent person high on crack cocaine leading the police on an extremely reckless car chase. The better instruction, we believe, is one that leaves aside the "reasonably prudent person"

and charges the jury to consider instead whether the *defendant*, in light of everyday experience, should have reasonably foreseen the result as a natural consequence of his illegal conduct.

In reviewing the instructions in their totality, we are not persuaded that they contained any substantial misstatement of the law, or that anything contained in the instructions on proximate cause would have misled the jury in a way affecting Lovelace's substantial rights. The instructions on proximate cause were sufficiently correct and clear to have permitted the jury to understand the relevant law as applied to the case. Therefore the instructions were neither erroneous nor prejudicial. Lovelace's second assignment of error is overruled.

### Evidentiary Rulings

In his third assignment of error, Lovelace asserts that the trial court erred when it refused him the right to cross-examine Officer Berting on the basis of police pursuit policy and other exhibits demonstrating his history of violating that policy. According to Lovelace, the trial court's refusal to allow him to cross-examine on these matters was particularly unfair in light of Officer Berting's testimony that he was following proper police procedure.

Before discussing the merits of this assignment of error, we must address the state of the record before us. Although the admitted exhibits are part of the record certified to us, the proffered exhibits are not. A review of the transcript shows that counsel for Lovelace stated that "at the end of the day" he intended to proffer three exhibits—the "pursuit policy," Officer Berting's personnel file, and "the internal investigation finding that [Officer Berting] did violate the pursuit policy and he was not doing his job * * *." At the end of the case, after discussing the jury instructions, counsel for Lovelace once again raised the matter of the proffered exhibits, at which point the trial court stated that the exhibits had already been proffered on the record and had been "accepted." For some reason, however, the proffered exhibits are not in the record on appeal.

It is the appellant's responsibility to ensure that the complete record is before this court. We cannot pass on the admissibility of proffered exhibits not before us based solely on the representations of counsel as to what those exhibits contain.

However, an excerpted portion of the pursuit policy was admitted at the pretrial hearing on Lovelace's motion to dismiss, and this exhibit is part of the record before us. This exhibit deals with the "emergency operation of police vehicles," Procedure 12.535, and states that officers are required to balance the seriousness of the situation against the hazards to other citizens. The policy specifically states, "Officers must terminate their involvement in motor vehicle

pursuits whenever the risks to their safety and others outweigh the consequences of the suspect's escape." Furthermore, Procedure 12.535(A)(2)(a) requires the police while driving in an emergency mode to stop their vehicles when approaching a red traffic signal or stop sign. Procedure 12.535(A)(4)(a) limits the pursuit to no more than two police vehicles unless the pursuit officer in charge directs otherwise. Finally, Procedure (A)(4)(d) expressly prohibits "[c]aravans of police vehicles in pursuit."

Also at the hearing on the motion to dismiss, the defense submitted as an exhibit a document entitled "Evaluation Supplemental Log." It is unclear whether this document is the proffered exhibit identified by defense counsel as the "personnel file." The evaluation consists of one page and notes that Officer Berting was counseled on July 5, 1996, after violating Procedure 12.535 "by pursuing a motor vehicle into Kentucky that was only wanted for traffic violations."

Finally, attached to a defense pretrial motion captioned "Motion of Intent to Present a Complete and Meaningful Defense" is the report of the Internal Investigations Unit. The investigation concluded that Officer Berting had failed to stop at the stop sign governing the intersection of Produce and Central. The investigation concluded further that Officer Berting had failed to conduct himself in a manner becoming to a member of the police force; had violated Procedure 12.535(A)(2)(a) by running a stop sign while in pursuit; had committed vehicular homicide in violation of R.C. 2903.07; and had failed to operate official vehicles in a careful and prudent manner.[8]

The state filed a motion in limine to preclude the use of these exhibits, as well as other materials, at trial. Although it is clear from a review of the transcript (as well as Lovelace's third assignment of error) that the motion must have been granted, we cannot find where in the record this ruling was made, or a statement of the trial court's reasons for ruling as it did.

██ "Generally, the admission or exclusion of relevant evidence is committed to the sound discretion of the trial court." *State v. McMillian* (May 8, 1996), Hamilton App. No. C–950523, unreported, 1996 WL 233866, citing *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus. In order for an appellate court to hold that the trial court abused that

---

8. We cannot find anywhere in the record other materials referred to by Lovelace under this assignment of error. Specifically, we do not have before us the Police Performance Supplement dated June 18, 1998, which Lovelace describes as containing a finding that Officer Berting was not the primary or secondary pursuit officer and had violated Procedure 12.535. Nor do we have a document described by Lovelace as interdepartmental correspondence in which Officer Berting's captain criticized him for failing to adhere to rules and procedures governing police pursuit.

225

discretion, it must conclude that the decision to admit or exclude evidence constituted a clear abuse that materially prejudiced the defendant. *Id.*

Presumably the trial court refused admission of these exhibits on the basis of *Schmies, supra,* since it voiced its strong approval of the *Schmies* decision throughout the course of the trial. We have already expressed our agreement with the *Schmies* analysis. Unless it is presumed that Lovelace actually knew about the Cincinnati Police Department's rules of pursuit or Officer Berting's personnel record, or that he should have known about them, there is simply no way that these matters can be deemed relevant to his capacity to foresee the accident that killed Tenhundfeld. This point is well illustrated by the following example set forth by the court in *Schmies:*

"Assume, for purposes of illustration, a bank has a written policy that its armed guards should not fire their weapons at an armed robber if the bank is full of customers. Nevertheless, in the course of an armed robbery during business hours the guard, fearing the robber might injure or kill someone, predictably fires at the robber but misses and kills a customer. Can the defendant robber charged with the murder of the customer establish that the shooting by the guard was a superseding cause because it violated the bank's rules? The answer to that hypothetical is the same as the answer to the identical claim in this case: no. * * * The task of the jury is to determine whether the officers' response was so extraordinary that it was unforeseeable, unpredictable and statistically extremely improbable. A rule violation may give rise to civil liability or disciplinary action, but it has nothing to do with the foreseeability of the officers' conduct." *Schmies, supra,* at 55–56, 51 Cal.Rptr.2d at 196.

Even assuming the relevance of these exhibits, we could not say that their exclusion was prejudicial since they were largely cumulative to what the jury had already learned. As we have pointed out, the jury heard testimony from Officer Berting and the other officers that they were trained not to disregard citizen safety even while in pursuit. Officer Berting testified, in fact, that he "knew better" than to run a stop sign even under emergency circumstances. And, finally, the disclosure that Officer Berting had been discharged from the police force and charged with vehicular homicide as a result of his role in the accident had to have made clear to the jury that Officer Berting's conduct was not only deemed improper by his superiors, but also a cause for his dismissal.

Given the evidence that was already before the jury establishing the impropriety and official condemnation of Officer Berting's conduct, the trial court could have reasonably concluded that the probative value of the additional exhibits proffered by Lovelace, even assuming their relevance, was outweighed by the potential for prejudice. The exhibits could have easily misled the jury into focusing on the reasonableness of Officer Berting's response from the standpoint

of police training and procedure as opposed to its foreseeability by someone completely unfamiliar with such matters.

We reject, furthermore, Lovelace's argument that the prosecution opened the door for this evidence by asking Officer Berting if he perceived his attempts to become involved in the chase as "part of [his] duty" as a police officer. The question was general enough not to invoke specific matters of policy or rules violations. Similarly, the prosecution's question to Officer Berting inquiring whether there was any rule prohibiting an officer from chasing a vehicle into another district was not addressed by the proffered exhibits, and was not sufficient in itself to open the door to a general inquiry whether Officer Berting had violated any departmental rules.

Lovelace's third assignment of error is, therefore, overruled.

### Evidence of Prior Acts

In his fourth assignment of error, Lovelace argues that the trial court erred by "refusing to allow him to defend himself that it was the officer's conduct that was reckless to the point where the officer was the one who should have been on trial for involuntary manslaughter * * *." Under this assignment, Lovelace again challenges the trial court's refusal to allow him to introduce the warnings and reprimands Officer Berting received regarding police pursuit policy, as well as the trial court's refusal to allow him to produce evidence of Office Berting's record of traffic accidents. According to Lovelace, the purpose of this evidence was to "demonstrate that Officer Berting had knowledge of his actions and his running through the stop sign was not a mistake but intentional. As a result, Officer Berting is the one who actually committed involuntary manslaughter * * *."

As can be seen, Lovelace's fourth assignment of error is closely related to his second and third assignments. For the same reasons we have previously discussed, we reject his argument. The issue at trial was not whether Officer Berting's conduct was reasonable, or contrary to departmental rules, but whether Lovelace could or should have foreseen it as a natural consequence of the high-speed police chase that he caused. The trial court was well within its discretion, given the potential for leading the jury down a false path, to refuse admission of evidence that dealt in detail with police pursuit policy, Officer Berting's past record of violating the policy, or Officer's Berting's record of traffic accidents.[9]

Lovelace's fourth assignment of error is overruled.

---

9. It should be pointed out, in light of our discussion of the state of the record under the second assignment of error, that we cannot find any evidence or proffer of evidence with respect to Officer Berting's record of traffic accidents.

## Crim.R. 29 Motion for Acquittal

In his fifth assignment of error, Lovelace argues that the trial court erred when it failed to grant his Crim.R. 29 motion for acquittal, which "incorporated" an earlier motion to dismiss. The basis of his argument, which even he admits is "weak," is that, because involuntary manslaughter requires a predicate felony, the indictment was defective absent an earlier determination that his failure to comply with the lawful order or signal of a police officer had proximately caused serious physical injury. According to Lovelace, "Failure to comply by the plain reading of the statute [R.C. 2921.331(C) ] does not become a felony until the trier of fact says so."

We agree with Lovelace that his argument is "weak." There is no requirement that the defendant have been previously found guilty of the underlying felony before he can be charged with involuntary manslaughter. Furthermore, as the state points out, Lovelace did not raise this issue before the trial court, and it is therefore waived. *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364.

Lovelace's fifth assignment of error is overruled.

## Cumulative Errors

In his sixth and final assignment of error, Lovelace argues that although "[a]ll of the errors * * * alleged in [his] brief may or may not by themselves amount to much," when they are considered together, "it is obvious that the trial court denied [him] his due process rights to a fair trial." Again Lovelace decries the fact that he was not allowed to present evidence of Officer Berting's failure to adhere to departmental pursuit policy or of his traffic records. He claims that denial of this line of inquiry "handcuffed" his defense by precluding him from presenting "any type of defense on intervening cause."

As we have stated, the sole issue at trial was whether Lovelace could or should have foreseen the accident. This question was relatively simple: what was, or should have been, going through Lovelace's mind as he sat behind the wheel of the Grand Am and raced to keep ahead of the officers chasing him? Unless one assumes that Lovelace was mentally reviewing police pursuit policy or the traffic records of the individual officers chasing him as he was driving, these things simply did not matter.

Other than to prohibit Lovelace from delving into matters that could not possibly have played any role in his thinking at the time of the accident, and that therefore he could not possibly have relied upon, the trial court did not restrain Lovelace from presenting a defense of intervening cause. Questioning was allowed on many extraneous matters, including how the other officers in pursuit

reacted to stop signs and stop lights; whether the officers were trained to put safety of the public above apprehension of the suspect; the fact that Officer Berting, as he admitted, "knew better" than to run a stop sign even while in pursuit; that Officer Berting was discharged from the police force as a result of the accident; and that Officer Berting was facing a criminal charge of vehicular homicide.

Nor, as we have previously discussed, do we hold it error for the trial court to have instructed the jury, as it did, that notwithstanding the evidence that Officer Berting had erred, perhaps criminally, in his conduct, his blameworthiness was not at issue in the case. This was, in our view, a correct statement of the law.

Lovelace's sixth assignment of error is, therefore, overruled.

## Conclusion

In summary, Lovelace set in motion a series of events when he led the police on an extremely dangerous car chase. The car chase led directly to the death of Michael Tenhundfeld. Lovelace's culpability on the charge of involuntary manslaughter depended upon whether the accident that killed Tenhundfeld was within the scope of the risk that he created. The answer to this question depended upon whether Lovelace should have reasonably foreseen the danger of such an accident.

Whether Officer Berting acted reasonably or violated departmental policy was not an issue at trial. At issue, rather, was the foreseeability of Officer Berting's response from the perspective of a person of ordinary experience—not an expert on police chases. Grasping this distinction, the trial court allowed in evidence that Officer Berting had acted contrary to his training and made a mistake of judgment that cost him his job as a police officer and resulted in a charge of vehicular homicide. The trial court, however, refused the admission of evidence that would have taken the jury far afield into matters of police pursuit policy and Officer Berting's personnel record.

Finally, the jury was correctly instructed that Lovelace was not guilty of involuntary manslaughter if the accident that killed Tenhunfeld was so unexpected or extraordinary that it could not have been reasonably foreseen by him. The jury, obviously, concluded otherwise. We find no error with this conclusion on the record before us.

Based upon the foregoing, Lovelace's six assignments of error are overruled and the judgment of the trial court is, accordingly, affirmed.

*Judgment affirmed.*

HILDEBRANDT, P.J., concurs.

PAINTER, J., dissents.

PAINTER, Judge, dissenting.

The majority opinion, in the very first sentence, so misstates the issue that the error of its conclusion necessarily follows: the issue is not whether the defendant here "can be found guilty." He can. The issue is whether the jury was properly instructed.

The majority's citation of *State v. Chambers* (1977), 53 Ohio App.2d 266, 7 O.O.3d 326, 373 N.E.2d 393, as the leading case on this issue is puzzling. The quotation from *Chambers,* that the death must be the "direct, proximate, and reasonably inevitable" consequence of the defendant's conduct, would be a high burden for the state. If those words were employed in the jury instructions, they would be too one-sided for the *defense.* But having cited *Chambers,* the opinion proceeds to disregard the language it just quoted with approval. The *Chambers* formulation would be proper for a jury instruction if the word "inevitable" were deleted and "foreseeable" put in its place.

In my view, the jury instructions on the issue of proximate cause were so one-sided and misleading that the jury was virtually instructed to find the defendant guilty. The California case relied on by the trial court,[10] and accepted by the majority here, states that the officer's conduct, even if criminal, is immaterial to a determination of proximate cause. That statement would necessarily lead the jury to *disregard* any conduct by the officer in considering foreseeability. While a properly instructed jury might find guilt in this case, the instructions here amounted to an instruction to find the defendant guilty—a usurpation of the jury's role. I would remand for a new trial under proper instructions.

---

10. *State v. Schmies* (1996), 44 Cal.App.4th 38, 51 Cal.Rptr.2d 185.