DECISION.
The defendant-appellant, Andre Buck, brings this appeal from his convictions for failure to comply with the order or signal of a police officer in violation of R.C.2921.331(B), as he stood charged in the first count of the indictment, and for assault upon a police officer in contravention of R.C. 2903.13(B), as charged in the second count. As given, the assignments of error are as follows:
 The trial court erred in ruling that appellant recklessly caused serious physical harm.
 The trial court incorrectly ruled that appellant's conduct caused a substantial risk of serious physical harm to persons or property.
 It is manifest, both from the record and from the manner in which the issues have been presented in the trial forum and before this court, that the material facts upon which the prosecution relied to establish Buck's guilt are not in dispute. The questions posed by the assignments, which have been argued together, are fundamentally ones of law.
At 3:30 a.m., on January 24, 2000, Cincinnati police officers Carter and Wigginton, on routine patrol in a marked vehicle, saw Buck driving a passenger car in which three others were seated, on a public thoroughfare, without illuminated headlights. The officers activated the overhead lights on their car and sounded a siren in an effort to stop Buck. Although Buck first appeared willing to comply with the signals, he accelerated suddenly and commenced what developed into a relatively extended, frenetic flight from the scene. Immediately, Carter and Wigginton began their pursuit.
At that time, the weather had left the streets scattered with snow and ice. Buck drove his car at speeds approaching seventy miles per hour, sometimes on the wrong side of streets on which other traffic was traveling, narrowly missing several heavy delivery trucks. Other police cars joined the chase. Buck managed to elude them, but finally edged his car to the curb of a street on a steep hill. He jumped from the car while it was still in motion. At least one of the passengers fled with him, but another was able to get behind the wheel and stop the car.
The chase then proceeded on foot. Despite repeated shouts from the officers to stop, Buck continued to run. He led his pursuers down the steep grade of a hillside covered with snow, ice, broken glass bottles, brush, and tree stumps. Officer Keith Witherell, the victim specified in the second count as the peace officer injured while engaged in the performance of his official duties, slipped and fell as he ran down the slope after Buck. His fall was so violent that his right buttock was pierced, apparently by one of the tree stumps. The wound was some six inches in length and four inches in depth. Surgeons at the hospital to which Witherell was taken (after his fellow officers had captured Buck) sutured the laceration with a single running interior stitch and twelve individual surface stitches. Witherell was disabled for fifteen days and now bears a permanent disfiguring scar from the injury.
The indictment was returned on February 1, 2000, and on April 17, Buck, while represented by retained counsel, waived his right to trial by jury. At the close of the state's case-in-chief, Buck elected not to present any evidence and his counsel moved for acquittal pursuant to Crim.R. 29.
In the course of his argument in support of the motion, Buck's counsel conceded that Officer Witherell had been engaged in the performance of his official duties when he was injured, but asserted that "the question comes down to whether or not he [Buck] recklessly caused serious physical harm to the police officer." He condensed Buck's theory of defense in these terms:
 This case is best described as a freak accident. It's a very unfortunate situation that a police officer was chasing somebody and fell down and suffered a very serious harm. But I don't think it was inevitably foreseeable in Mr. Buck's mind that when he fled, this officer is going to fall down and impale himself on a stump.
In context, counsel then submitted the following:
 I don't think there's any doubt that had Mr. Buck not run from the police, the officer never would have chased him and never would have fallen down.
 But * * * the result [can]not be so extraordinary or surprising to the extent it would be unfair to hold the defendant criminally responsible for something so unforeseeable. I think that's what we have. It was a freak situation and a surprise situation. As unfortunate as it was, obviously Mr. Buck had no intent to harm this officer.
 When it overruled Buck's motion for acquittal and then decided the case on its merits, the court gave an extended statement of its analysis of the facts and applicable law. In part, the court offered these comments on Buck's expectations during his pell-mell descent down the hill:
 [C]ertainly, he could have anticipated that somebody would fall.
 It's my understanding of the evidence that there were four officers chasing, and two of them fell. That's a pretty good indication to the extent to which the circumstances presented a danger to those chasing Mr. Buck.
 A key component of this that distinguishes it from an innocent act or such that [defense counsel] was concerned with is perverse disregard. As [defense counsel] pointed out, he just wanted to get away, and he had no consideration for the significance and strong possibility that somebody would fall. And, clearly, if somebody falls running down a hill with debris and stumps, there is a substantial likelihood that person can be injured. It's not necessary, under these tests, that Mr. Buck would anticipate the nature and extent of the injuries, that he was not required, but it's certainly a known risk that when somebody falls under those circumstances, they could get injured or killed. And we could be here under an involuntary manslaughter.
 It is clear from the court's dissertation that it was guided by this court's decision in State v. Lovelace
(1999), 137 Ohio App.3d 206, 738 N.E.2d 418, and by the rationale of the Court of Appeals for Lorain County in State v. Chambers (1977), 53 Ohio App.2d 266, 373 N.E.2d 393. The court below found significance in this court's observation in Lovelace that both the prosecution and the defense had acknowledged Chambers
as "the leading case interpreting the element of proximate cause in the involuntary manslaughter statute." Lovelace, supra at 215, 738 N.E.2d at 424. The court in Chambers held that the proximate-cause element is satisfied "when the accused sets in motion a sequence of events that make[s] the death of another a `direct, proximate, and reasonably inevitable' consequence." Lovelace, supra at 215, 738 N.E.2d at 424. In Lovelace, we went on to note the following:
 Applying the test in Chambers, Ohio appellate courts have upheld involuntary-manslaughter convictions in any number of unique factual scenarios. In State v. Losey
(1985), 23 Ohio App.3d 93, * * * 491 N.E.2d 379, for example, the defendant's conviction was affirmed where a homeowner suffered a fatal heart attack after awakening to find that her residence was being burglarized. In State v. Williams (1990), 67 Ohio App.3d 677, 588 N.E.2d 180, the court affirmed the defendant's conviction based upon his participation in an unruly mob that beat a person senseless and then left him lying in the street to be later run over and killed by a passing automobile.
Id. at 215, 738 N.E.2d at 424-425. With respect to the conjoined issues of proximate cause and foreseeability, Lovelace stands for these theories:
 Generally, for a criminal defendant's conduct to be the proximate cause of a certain result, it must first be determined that the conduct was the cause in fact of the result, meaning that the result would not have occurred "but for" the conduct. Second, when the result varied from the harm intended or hazarded, it must be determined that the result achieved was not so extraordinary or surprising that it would be simply unfair to hold the defendant criminally responsible for something so unforeseeable. [Citation omitted.]
* * *
 * * * [In an involuntary-manslaughter prosecution arising from a death alleged to be the proximate result of the defendant's commission of a felony, t]he question of forseeability is determined from the perspective of what the defendant knew, or should have known, "when viewed in the light of ordinary experience." * * * Losey, supra, at 95, * * * 491 N.E.2d at 382.
* * *
 [In the context of an involuntary manslaughter prosecution arising from a death that is alleged to have proximately resulted from the commission of a felony,] for something to be foreseeable does not mean that it be actually envisioned.
Id. at 216, 219, 738 N.E.2d at 425, 427-428. Our holdings are a clear, current echo of the holding of the Court of Appeals for Lorain County inChambers that the proximate-cause theory of criminal liability is the applicable standard intended by the Ohio General Assembly.
Here, the trial court, by its own declaration, applied the "but for" test in these terms:
 But for Mr. Buck['s] choosing to head down a snowy, icy hill, when he's being pursued by police officers, clearly this accident would not have happened. Officer Witherell would not have fallen * * *. This is the situation we have. And so the Court's satisfied with the causation element.
 The record supports unequivocally the factual findings voiced by the trial court, and the law applied to those facts accords with that established in this district, elsewhere in Ohio, and in foreign states. See Lovelace, supra at 215-220, 738 N.E.2d at 424-428.
Given that Buck exercised his right not to testify or, indeed, not to adduce any evidence, his motivation to flee from the police remained enigmatic until he and his counsel responded to the court's invitation to speak upon allocution after it had in hand a presentence report. It developed then that a loaded weapon, a mask and marijuana had been recovered from Buck's car, that he was on parole for "drug abuse," and that, in addition to the violation for which he had been imprisoned, Buck had a number of convictions for misdemeanors and an acknowledged "problem with alcohol and drugs." To his credit, Buck personally expressed remorse and recognized that he "was wrong by running," and that Officer Witherell "got hurt, and justice has got to be served." Buck repeated his apology to the officer and concluded by requesting that the court "be lenient, if that's possible." Obviously, the court was lenient. The sentences on both counts (three years on count one and one and one-half years on count two) were less than the maximum permissible sentences and were ordered to run concurrently.
For the preceding reasons, we conclude that neither of Buck's assignments of error is well taken, and they are, accordingly overruled.
Doan, P.J., Winkler and Shannon, JJ.
Raymond E. Shannon, retired, from the First Appellate District, sitting by assignment.