OPINION
{¶ 1} Appellant, Stanley T. Adams, appeals from the December 11, 2000 judgment entry of the Trumbull County Court of Common Pleas, in which appellant was convicted and sentenced for murder and rape.
 {¶ 2} On March 16, 2000, appellant was secretly indicted by the Trumbull County Grand Jury on one count of aggravated murder with specifications of aggravating circumstances, in violation of R.C. 2903.01(B) and R.C. 2929.04(A)(7), one count of rape, a felony of the first degree, in violation of R.C. 2907.02(A)(1) and (2), and one count of aggravated arson, a felony of the first degree, in violation of R.C. 2909.02(A)(1). On March 16, 2000, appellant entered a not guilty plea at his arraignment. On March 30, 2000, appellant filed a motion to suppress statements, a motion to suppress fruits of an unconstitutional arrest, and a constitutional motion to dismiss, which were all denied. Also, on March 30, 2000, appellant filed a motion for an order directing that a complete copy of the prosecutor's file be made and turned over to the court for review and be sealed for appellate review, if necessary, as well as a motion to compel disclosure of exculpatory and impeachment evidence, which were ultimately granted.
 {¶ 3} A jury trial commenced on October 13, 2000. The trial court sustained appellant's motion for acquittal as to the aggravated arson charge and the arson specification to the aggravated murder charge. Appellant was found guilty of the remaining aggravated murder count with an aggravated circumstance of rape and the rape charge. On November 9, 2000, appellant filed a motion for mistrial, as well as a motion for a new trial and/or judgment notwithstanding the verdict. On November 15, 2000, a judgment entry was filed, which denied appellant's motion for mistrial, but granted the motion for judgment notwithstanding the verdict as to the aggravated murder charge with a specification. The trial court then entered a verdict against appellant on the lesser included offense of murder pursuant to R.C. 2903.02(B), but did not disturb the jury's guilty verdict on the rape charge.
 {¶ 4} The essential facts presented in evidence at the trial are as follows: David Taylor ("David") and Roslyn Taylor ("Roslyn") were divorced and had an unconventional relationship. Although they continued to live together, Roslyn was in the process of moving out. In addition, Tara Evans ("Tara") and Fahim Evans ("Fahim"), as well as Tracy Justice ("Justice"), lived in David's home, located at 6301 Morningside Drive, Hubbard, Ohio. David and Roslyn had problems with cocaine and alcohol. Roslyn also had problems with Valium (a muscle relaxant).
 {¶ 5} On the night of August 4, 1999, at approximately 10:00 p.m., Roslyn and Justice, who were long time friends, went to the Motor Bar on Logan Avenue in Youngstown, Ohio. David arrived at the bar and ordered Roslyn to return home. Roslyn and Justice left the bar around 1:00 a.m. on August 5, 1999. Because Roslyn's driving was so poor, due to her consumption of alcohol and Valium, Justice asked Roslyn to stop the vehicle, and Justice drove the rest of the distance to David's home.
 {¶ 6} About 2:00 a.m., appellant arrived at David's home with Millie Homa ("Millie") and John Gaia. Roslyn and appellant began kissing and fondling one another. Justice heard Roslyn say that she thought appellant was cute and that she was thinking about having sex with him. Roslyn later told Justice that she planned to engage in sex with appellant on David's bed.
 {¶ 7} At approximately 2:30 a.m., David returned home. A verbal argument ensued between David and Roslyn, which escalated into a physical encounter. Justice stated that David and Roslyn pushed each other, and Roslyn threw objects at David. David became very angry and punched and kicked a door, causing it to fall from its hinges and resulting in David's wrist and/or hand breaking. David and Roslyn also fought over drugs, which led to an encounter where David and Roslyn pushed each other back and forth, causing Roslyn's head to hit a cupboard.
 {¶ 8} David left the house immediately. Roslyn and appellant left the house together approximately five minutes later, around 2:30 a.m., but in separate vehicles. David returned to his house about fifteen minutes later, moaning and groaning in pain from his wrist/hand injury. Around 3:50 a.m., Tara fixed David something to eat. When David was unable to take the pain any longer, Fahim drove him to the hospital at 5:30 a.m. and returned home around 7:00 a.m.
 {¶ 9} On August 6, 1999, Roslyn's body was discovered by police after a resident reported the vehicle as suspicious. Roslyn's vehicle was found at the end of Oakmont Drive in Hubbard Township, Trumbull County, Ohio. The car had severe smoke and fire damage, its windows were covered with soot, and it was positioned with one wheel over a railroad track. A fire of undetermined origin had ignited behind the driver's seat of the car. Roslyn's body was found on the vehicle's passenger side, lying on her right side, facing the rear of the vehicle. Roslyn's blue jean shorts were pulled down to her knees and her tank top was up below her breasts.
 {¶ 10} Dr. Humphrey D. Germaniuk ("Dr. Germaniuk"), medical examiner for Trumbull County, performed an autopsy on Roslyn and found a wound on her upper right forehead, swelling on her lower right to her mid forehead, and bruising on her abdomen, right arm, and tongue. Bruising was also spotted on Roslyn's hip, which was likely caused by Roslyn being dropped or pushed into the vehicle. Dr. Germaniuk also documented defensive wounds to the back of Roslyn's hands, a blackened left eye, and a fractured hyoid bone. Dr. Germaniuk found petechiae, which in a situation like this, may be indicative of some type of asphyxia, choking, or strangulation. Dr. Germaniuk opined that all of the injuries occurred in less than thirty minutes, perhaps only minutes before Roslyn's death.
 {¶ 11} A toxicology report revealed that Roslyn had a blood alcohol level of .268, nearly two and one-half times over the legal limit to drive a vehicle in Ohio, as well as a therapeutic level of Valium in her system. Dr. Germaniuk also performed a sexual assault kit on Roslyn. Although he could conclude that Roslyn had engaged in sexual activity, Dr. Germaniuk could not pinpoint a specific time that she had sex. Dr. Germaniuk found no evidence of trauma to the anal or vaginal areas of Roslyn's body. Also, as part of his examination, Dr. Germaniuk took fingernail scrapings from Roslyn's body, sealed them in an envelope, and submitted them to the Ohio Bureau of Criminal Identification and Investigation ("BCI"). Dr. Germaniuk listed the cause of Roslyn's death as acute carbon monoxide intoxication and estimated the time of death between 6:00 a.m. to 6:30 p.m. on August 5, 1999.
 {¶ 12} Because appellant was the last person known to have seen Roslyn alive, Hubbard Township Police Officer Joyce Coleman ("Officer Coleman") interviewed appellant on August 9, 1999. Officer Coleman and Detective McBride encountered appellant in the Warren Municipal Court. Detective McBride read a Miranda rights form to appellant, who initialed and signed the form. Appellant acknowledged that he saw Roslyn at David's home, claimed that he had no physical contact with her, then stated that he and Roslyn may have hugged. During the interview, Officer Coleman noticed an egg-shaped burn mark on appellant's left forearm.
 {¶ 13} On October 20, 1999, Warren City Police Detective Emanuel Nites interviewed appellant.[1] Appellant claimed that he was not with Roslyn and had no idea how her vehicle caught on fire. Appellant specifically denied having sex with Roslyn.
 {¶ 14} Two individuals from BCI testified at trial. Cynthia Shannon ("Shannon"), a forensic scientist, stated that she detected sperm in a rectal smear from Roslyn's body. This sample was submitted to Jennifer Duval ("Duval"), a DNA serologist, who compared the sperm sample to a blood, hair, and saliva sample from appellant. Duval concluded that the sample from Roslyn's body matched appellant's DNA by a statistical probability of one in over four and one-half billion. The fingernail scrapings, as well as a bloody ring taken from Roslyn's finger, were not tested by BCI. According to Shannon, because evidence of semen had been found, it was the policy of BCI that further testing stop.
 {¶ 15} Christina Homa ("Christina"), the incarcerated eighteen-year-old daughter of Millie Homa ("Millie"), testified for the defense. Christina described various incidents in which she had encounters with David. In either October or November of 1999, Christina contended that she was "kidnapped" by Millie and David, who threw her into the backseat of a car. Although Christina claimed that she escaped and related the incident to a police officer, no "kidnapping" was ever reported. Christina further held that during this incident with Millie and David, Christina fractured her ribs and went to the hospital. However, no medical records were produced to corroborate that Christina received medical treatment.
 {¶ 16} In September or October of 2000, approximately one year after Roslyn's death, Christina stated that in another incident, David bragged about choking Roslyn. Christina also claimed that David mounted a knife as a souvenir of incidents with Roslyn. Christina further contended that prosecutors told her not to mention the choking incident and the knife mounting. Also, on October 21, 2000, Christina had an interview with Sue Stinedurf ("Stinedurf"), an investigator with the Trumbull County Prosecutor's Office. Christina told Stinedurf that both appellant and David wanted to mount a knife to memorialize cuts to Roslyn's feet.
 {¶ 17} Pursuant to the trial court's December 11, 2000 judgment entry, the trial court sentenced appellant to serve a prison term of fifteen years to life on the murder charge and ten years on the rape charge, with the sentences to run consecutively. It is from that judgment that appellant filed a timely notice of appeal on December 12, 2000, and makes the following assignments of error:
 {¶ 18} "[1.] The trial court abused its discretion by denying appellant's motion for a new trial based upon prosecutorial misconduct.
 {¶ 19} "[2.] The trial court abused its discretion by failing to grant a new trial based upon prosecutorial misconduct resulting in the denial of appellant's rights to a fair trial and due process of law pursuant to the Sixth and Fourteenth Amendments.
 {¶ 20} "[3.] [Appellant's] convictions for rape and murder are not supported by sufficient evidence.
 {¶ 21} "[4.] [Appellant's] conviction for rape is against the manifest weight of the evidence."
 {¶ 22} In his first assignment of error, appellant argues that the trial court abused its discretion by failing to grant a motion for a new trial based upon prosecutorial misconduct where the record reveals that defense counsel objected throughout the trial to numerous discovery violations. According to appellant, after trial had begun, the trial court was forced to order the prosecution to turn over discovery that had been requested long before trial, and the trial court found the allegations of discovery violations sufficiently credible to order that the prosecution's file be sealed for availability of appellate review.
 {¶ 23} A motion for a new trial is governed by Crim.R. 33, which states in pertinent part:
 {¶ 24} "(A) Grounds
 {¶ 25} "A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:
 {¶ 26} "(1) Irregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial;
 {¶ 27} "(2) Misconduct of the jury, prosecuting attorney, or the witnesses for the state;
 {¶ 28} "(3) Accident or surprise which ordinary prudence could not have guarded against * * *."
 {¶ 29} As the court stated in State v. Schiebel (1990),55 Ohio St.3d 71, paragraph one of the syllabus, "[a] motion for new trial pursuant to Crim.R. 33(B) is addressed to the sound discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion." See, also, State v. Nahhas (Mar. 16, 2001), 11th Dist. No. 99-T-0179, 2001 Ohio App. LEXIS 1236, at 8. "No motion for a new trial shall be granted or verdict set aside, nor shall any judgment of conviction be reversed in any court * * * unless it affirmatively appears from the record that the defendant was prejudiced thereby or was prevented from having a fair trial." Crim.R. 33(E)(5). "The test for prosecutorial misconduct is whether the conduct complained of deprived the defendant of a fair trial." State v. Fears (1999), 86 Ohio St.3d 329,332, citing State v. Apanovitch (1987), 33 Ohio St.3d 19, 24.
 {¶ 30} A trial court need not conduct an in camera inspection of the prosecutor's file or order the file to be sealed for appellate review any time the appellant so requests. State v. Alexander (Nov. 29, 1996), 11th Dist. No. 93-T-4948, 1996 Ohio App. LEXIS 5418, at 11. An in camera inspection is not required when an appellant makes a general request forBrady material. State v. Lawson (1992), 64 Ohio St.3d 336, 344. Thus, there is also no requirement that the prosecutor's file be sealed for appellate review simply because an appellant makes a general discovery request for exculpatory material. Alexander at 13.
 {¶ 31} In the case at bar, prior to trial, appellant filed numerous motions seeking to insure that the state complied with the discovery requirements of Brady v. Maryland (1963), 373 U.S. 83. In particular, on March 30, 2000, appellant filed a motion for an order directing that a complete copy of the prosecutor's file be made and turned over to the court for review and be sealed for appellate review, if necessary. This motion was ultimately granted, even though appellant's request was general in that it directed that a complete copy of the prosecutor's whole file, rather than something specific within the file, be sealed for appellate review. See Pennsylvania v. Ritchie (1987), 480 U.S. 39, 46.
 {¶ 32} Nevertheless, in the interest of justice, this court complied with the trial court's request and reviewed the prosecutor's sealed file. After oral arguments, we permitted both appellant's counsel and an assistant prosecutor to review the file. Subsequently, appellant's counsel contended that three documents had not been provided to appellant prior to trial. This court then allowed both sides to submit supplemental briefing. According to appellant, the three documents contain two important pieces of information. Appellant argues that the documents show that two days after the murder, David was seen burning a blue blanket in a fire behind his house. Also, appellant asserts that the documents provide that Christina made a second statement to the police which further implicated David in the murder. Thus, appellant contends that if these two pieces of information had been presented to the jury, the outcome of the trial would have been different. We disagree.
 {¶ 33} In the instant matter, pursuant to the prosecutor's sealed file, as well as based on the record of the trial court, there is no evidence or testimony which connects David's blue blanket to the crime at issue. Under such circumstances, the state simply would have had no duty to reveal this information because it was not exculpatory in nature.
 {¶ 34} In regard to the police officer's summary of Christina's statement, this court would first note that, in addition to the officer's statement, the prosecutor's sealed file also contained transcripts of other interviews Christina gave to the police. Our review of the two transcripts shows that the statements Christina made during the interviews were virtually identical to the statements attributed to her in the police officer's summary. Furthermore, in reviewing the prosecutor's sealed file after oral arguments before us, appellant's trial counsel never stated that he had been denied access to the two transcripts. Thus, even if the state did fail to provide discovery of the summary, appellant could not have been prejudiced because his trial counsel was already aware of the information contained in the summary.
 {¶ 35} Second, as to appellant's contention that the police officer's summary further implicated David in the murder, this court would indicate that the statements made in the summary and the two interview transcripts were somewhat inconsistent with the testimony Christina gave at trial. In the summary and the transcripts, Christina stated that she had overheard David telling other people about choking the victim and cutting her feet with a knife. In contrast, Christina testified at trial that she had had a direct conversation with David on the matter. Based upon this, appellant now argues that the information in the police officer's summary shows that Christina actually had two separate conversations with David in which he implicated himself.
 {¶ 36} However, the trial transcript readily shows that the state fully cross-examined Christina concerning the inconsistencies between her direct testimony and her prior statements to the police. Our review of Christina's responses to the state's questions establishes that she was referring to the same basic incident to which she had cited in the prior statements; i.e., Christina never stated that her direct testimony concerned a separate incident than to what she had referred in speaking to the police. Taken as a whole, her testimony showed that she merely gave a slightly different version of the same incident.
 {¶ 37} In addition, this court would emphasize that the statements Christina attributed to David during her trial testimony were virtually identical to those she attributed to him in the summary and the interview transcripts. Therefore, notwithstanding the discrepancies concerning the manner in which David conveyed his statements during the single incident, it is apparent that the jury heard all relevant testimony Christina could give as to whether David had been involved in the murder.
 {¶ 38} In light of the foregoing, we hold that appellant has failed to demonstrate that the prosecutor's sealed file had any previously undisclosed documents containing new exculpatory evidence which appellant could have used in his defense. Even assuming arguendo that the state did fail to provide proper discovery of the three documents cited by appellant, the error was not prejudicial because it would not have changed the outcome of the trial.
 {¶ 39} "Exculpatory evidence" is defined as evidence favorable to the accused, which "if disclosed and used effectively, * * * may make the difference between conviction and acquittal." U.S. v. Bagley (1985),473 U.S. 667, 676. Appellant did not articulate to the trial court, nor does he reveal to this court, exactly what material evidence was contained in the various witness statements which may have made the difference between conviction and acquittal. See State v. Johnston
(1988), 39 Ohio St.3d 48, paragraph five of the syllabus.
 {¶ 40} Appellant's contention of a discovery violation in his original brief involved appellee's witness, Matthew Balut ("Balut"), a lieutenant from Champion Fire Department, who submitted inconsistent testimony which differed in part from his report. The discovery provided to appellant by way of Balut's opinion stated that the fire, which consumed Roslyn's vehicle, had an "undetermined origin." On cross-examination, Balut continued to hold that he could not state with certainty the source or cause of the fire. On redirect, the prosecutor had again elicited testimony that the fire could be "anything from a discarded cigarette to somebody using a lighter to set the fire." However, the trial court struck the redirect testimony and informed the jury to disregard it and not consider it for any purpose. Here, Balut's testimony varied from that rendered by him in his direct testimony and from that submitted in his cross-examination. Appellant was provided a report and had a right to examine the witness on the finding of that report.
 {¶ 41} Assuming arguendo that the prosecutor's actions were improper, we conclude that they did not prejudicially affect the substantial rights of appellant. In particular, the trial court cured any error by striking Balut's answers on redirect examination, as well as by dismissing the aggravated arson charge outright. Furthermore, no exculpatory evidence was discovered in the prosecutor's sealed file which would have changed the outcome of this case. Thus, appellant's first assignment of error is without merit.
 {¶ 42} In his second assignment of error, appellant argues that the trial court abused its discretion by failing to grant a new trial based upon prosecutorial misconduct resulting in the denial of appellant's rights to a fair trial and due process of law pursuant to the Sixth and Fourteenth Amendments. Appellant specifically contends that the prosecutor withheld discoverable materials, as well as promised its potential witnesses leniency in unrelated cases if they testified against appellant, rather than testifying as to their knowledge of certain facts which would exculpate the defendant.
 {¶ 43} The Sixth Amendment of the United Stated Constitution, made applicable to the states through the Fourteenth Amendment, states in pertinent part that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed * * *." Section One, of the Fourteenth Amendment, specifically states that "* * * nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."
 {¶ 44} In the case at bar, with respect to the discovery issue, appellant again argues that it is the duty of this court to comply with his general request to find possible discovery violations in the prosecutor's sealed file worthy of an order for a new trial. Consistent with our analysis in the first assignment of error, because appellant's request was general and based on Alexander and Lawson, supra, the trial court was not required to have the prosecutor's file sealed for appellate review. Again, this court complied with the trial court's request to review the sealed file but found no apparent discovery violations.
 {¶ 45} Appellant also alleges that appellee engaged in "witness tampering" with respect to Christina, and argues that pursuant to Crim.R. 33(A)(2), a new trial should be granted. Christina testified that the assistant prosecutor, Sarah Kovoor ("Kovoor"), and Stinedurf, told her not to mention an incident where David told Christina about how he choked Roslyn. Christina also alleged that Kovoor and Stinedurf told her to keep quiet with respect to David mounting a knife as a souvenir to represent incidents with Roslyn. However, Stinedurf denied the contentions made by Christina. Stinedurf testified that she did not order Christina not to talk to anyone else, but rather told her to be truthful. Stinedurf also stated at trial that she never told Christina to leave out part of her story or to conceal any comments David may have made.
 {¶ 46} "On the trial of a case, either civil or criminal, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. "A reviewing court may not reverse a judgment of conviction in a criminal case in a trial court, where the record shows that a verdict of guilty was returned by a jury on sufficient evidence and where no prejudicial error occurred in the actual trial of the case or in the instructions given the jury by the court." Id. at paragraph two of the syllabus.
 {¶ 47} In the instant case, Christina's favorable stories concerning appellant and the incriminating comments dealing with David were presented to the jury. Based on DeHass, supra, it was the jury's duty to determine the credibility of the witnesses. It appears the jury gave more weight and found Stinedurf's testimony more credible than Christina's. As such, based on the record and the evidence presented, the factfinders' conclusions did not deprive appellant of his right to a fair trial and due process of law. Therefore, appellant is not entitled to a new trial pursuant to Crim.R. 33. Thus, appellant's second assignment of error is without merit.
 {¶ 48} In his third assignment of error, appellant argues that his convictions for rape and murder are not supported by sufficient evidence.
 {¶ 49} As this court stated in State v. Schlee (Dec. 23, 1994), 11th Dist. No. 93-L-082, 1994 Ohio App. LEXIS 5862, at 13:
 {¶ 50} "`Sufficiency' challenges whether the prosecution has presented evidence on each element of the offense to allow the matter to go to the jury, while `manifest weight' contests the believability of the evidence presented.
 {¶ 51} "`"(* * *)The test (for sufficiency of the evidence) is whether after viewing the probative evidence and the inference[s] drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all of the elements of the offense beyond a reasonable doubt. The claim of insufficient evidence invokes an inquiryabout due process. It raises a question of law, the resolution of whichdoes not allow the court to weigh the evidence. * * *"'
 {¶ 52} "In other words, the standard to be applied on a question concerning sufficiency is: when viewing the evidence `in a light most favorable to the prosecution,' * * * `(a) reviewing court (should) not reverse a jury verdict where there is substantial evidence which the jury could reasonably conclude that all of the elements of an offense have been proven beyond a reasonable doubt.' * * *" (Emphasis sic.) (Citations omitted.)
 {¶ 53} "* * * [A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259,273; Jackson v. Virginia (1979), 443 U.S. 307, 319. Further, the verdict will not be disturbed on appeal unless the reviewing court finds that reasonable minds could not have arrived at the conclusion reached by the trier of fact. State v. Dennis (1997), 79 Ohio St.3d 421, 430.
 {¶ 54} Appellant's first question presented for review and argument deals with whether appellant's conviction for rape is supported by sufficient evidence when the record reveals that the alleged victim of the rape died without having had the opportunity to make any statements regarding the alleged rape, no evidence of sexual trauma was found on the alleged victim, the alleged victim had expressed her desire to engage in consensual sex with appellant the last time she was seen, and an expert testified that the alleged victim may have engaged in sexual activity prior to the events which caused her death.
 {¶ 55} R.C. 2907.02 states in pertinent part:
 {¶ 56} "(A)(2) No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force;
 {¶ 57} "(B) Whoever violates this section is guilty of rape * * *."
 {¶ 58} In the case at bar, the jury found appellant guilty of rape, pursuant to R.C. 2907.02. As indicated in the foregoing facts, an autopsy, performed on Roslyn's body by Dr. Germaniuk, revealed defensive wounds, swelling, bruising, a blackened left eye, a fractured hyoid bone, and petechiae. Dr. Germaniuk performed a sexual assault kit on Roslyn and concluded that she had engaged in sexual activity, but could not pinpoint a specific time that she had sex. Also, Dr. Germaniuk found no evidence of trauma to the anal or vaginal areas of Roslyn's body. However, forensic scientist Shannon detected sperm in a rectal smear and submitted it to Duval for testing. Duval compared the sperm sample from Roslyn's body to a blood, hair, and saliva sample obtained from appellant, which matched appellant's DNA.
 {¶ 59} Appellant argues that he never engaged in anal sexual activity, despite the fact that his sperm was found in Roslyn's anal cavity. Appellant offered no other explanation as to how his sperm would find its way into Roslyn's rectum other than through the sexual conduct of anal intercourse. See State v. Harris, 2d Dist. No. 19311, 2003-Ohio-1046, at ¶ 11. Even appellant's counsel conceded that appellant had engaged in sexual contact with Roslyn and that the DNA, located in Roslyn's anal cavity, matched appellant. However, appellant's counsel stressed that there was no evidence to prove that appellant did anything outside of having sex with Roslyn. We disagree.
 {¶ 60} In State v. Carter (2000), 89 Ohio St.3d 593, the Supreme Court of Ohio found sufficient evidence to support a rape conviction, where the defendant denied having sexual conduct with the decedent, even though the defendant's semen was discovered in the decedent's rectum. The court stated that the "[defendant] argues that there was no `sexual conduct,' i.e., penetration, to the anus of the victim. Instead, [the defendant] presented a theory at trial that the semen was deposited on the outside of the body and seeped into the anus. The evidence in the record strongly supported the state's theory that [the defendant's] sperm, found in the victim's anus and positively identified through DNA testing, was placed there through the insertion of [the defendant's] penis into the victim's anus. The evidence did not support an acquittal on the charge of rape." Id. at 601.
 {¶ 61} In the instant matter, appellant was the last person seen with Roslyn on the night in question. Rosyln's body was found with physical injuries. Dr. Germaniuk opined that all of Roslyn's injuries occurred in less than a half-hour, perhaps only minutes before her death. When Roslyn's body was discovered, her shorts were pulled down to her knees and her tank top was up below her breasts. Sperm was found in Roslyn's anal cavity which matched appellant's DNA by a statistical probability of one in over four and one-half billion. Therefore, based on these facts, as well as Harris and Carter, supra, there was sufficient evidence to prove the element of sexual conduct.
 {¶ 62} Appellant next argues that appellee failed to prove the element of force or threat of force, pursuant to R.C. 2907.02(A)(2). Again, however, due to the condition of Roslyn's clothing, as well as the bodily injuries she sustained, the trier of fact could reasonably conclude that appellant used force to facilitate anal sex with her. Although Dr. Germaniuk found no evidence of trauma to the anal or vaginal areas of Roslyn's body, he testified that the combined effects of alcohol, Valium, trauma to the head, and strangulation, would cause the tone of the sphincter muscle to decrease, which may have contributed to the lack of physical damage to Roslyn's anus. Dr. Germaniuk further stated that the absence of trauma to the genitalia does not preclude that force was involved in the sexual act. The foregoing facts show that Roslyn could not have sustained such severe injuries during her brief confrontation with David. Justice even testified that when she saw Roslyn leave David's house for the last time, she noticed no visible injuries on her. Thus, according to Dr. Germaniuk's and Justice's testimony, as well as Roslyn's bodily injuries and state of undress, there was sufficient evidence to prove that force was used when the sexual conduct occurred pursuant to R.C. 2907.02(A)(2).
 {¶ 63} Appellant's second question presented for review and argument deals with whether his conviction for murder, pursuant to R.C. 2903.02(B), is supported by sufficient evidence. Appellant stresses that the record reveals that an expert testified that the immediate cause of the death of the alleged victim was acute carbon monoxide inhalation, the underlying felony of violence supporting the murder charge is rape, and there is no evidence that appellant started or had reason to know of the fire which produced the carbon monoxide that cause the alleged victim's death.
 {¶ 64} R.C. 2903.02(B) states in pertinent part that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *."
 {¶ 65} "`* * * [P]roximate result' bears a resemblance to the concept of `proximate cause' in that (a) defendant will be held responsible for those foreseeable consequences which are known to be, or should be known to be, within the scope of the risk created by his conduct. (* * *) Here, that means that death reasonably could be anticipated by an ordinarily prudent person as likely to result under these or similar circumstances. (* * *).' (Citations omitted.)" State v. Gibson (June 27, 1997), 11th Dist. No. 95-P-0125, 1997 Ohio App. LEXIS 2898, at 12-13, quoting State v. Losey (1985), 23 Ohio App.3d 93, 95.
 {¶ 66} In the case at bar, the trial court had sufficient evidence to determine that appellant caused the death of Roslyn as the proximate result of having committed rape, a felony of the first degree, pursuant to R.C. 2903.02(B). According to the foregoing facts, appellant beat and strangled Roslyn, leaving her in either an unconscious or comatose state. Dr. Germaniuk testified that he found petechiae, which in this type of situation, may be indicative of some type of asphyxia, choking, or strangulation. Based on Gibson and Losey, supra, an ordinarily prudent person could anticipate that death is a foreseeable consequence when a victim's neck is compressed to the point that his or her hyoid bone becomes fractured, which renders the victim incapacitated. Death is also a foreseeable consequence and could be reasonably anticipated by leaving a victim alone in an unconscious or comatose state without any medical attention.
 {¶ 67} Appellant stresses that the immediate cause of Roslyn's death was carbon monoxide intoxication. Appellant argues that even if he did rape, beat, and leave Roslyn alone in the vehicle, he could not have foreseen that the vehicle would unexplainably burst into flames. According to appellant, the car fire was both an intervening force and entirely unforeseeable. We disagree.
 {¶ 68} Balut testified that although the cause of the fire was undetermined, it did not appear to be accidental. Also, Dr. Germaniuk repeatedly stated that Roslyn died of carbon monoxide intoxication because her injuries incapacitated her to the point where she could not extricate herself from the burning vehicle. Therefore, if Roslyn had not been raped, strangled, or beaten into a stupor in the first place, she most likely would have been able to get out of the burning vehicle alive.
 {¶ 69} The immediate cause of death, carbon monoxide intoxication, was a proximate result of the rape victim being left alone, incapacitated, and without medical attention. As such, an ordinarily prudent person could anticipate that death was a foreseeable consequence. See Gibson andLosey, supra. Therefore, the trial court's determination of guilt, pursuant to R.C. 2903.02(B), was proper. Thus, appellant's third assignment of error is without merit.
 {¶ 70} In his fourth assignment of error, appellant argues that his conviction for rape is against the manifest weight of the evidence.
 {¶ 71} In Schlee, supra, at 14-15, the court stated that "`manifest weight' requires a review of the weight of the evidence presented, not whether the state has offered sufficient evidence on each element of the offense.
 {¶ 72} "`In determining whether the verdict was against the manifest weight of the evidence, "(* * *) the court reviewing the entire record,weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. (* * *)"' (Citations omitted.) * * *" (Emphasis sic.)
 {¶ 73} A judgment of a trial court should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." State v.Thompkins (1997), 78 Ohio St.3d 380, 387.
 {¶ 74} In the case sub judice, appellant's sperm was found in Roslyn's anal cavity. Even appellant's counsel conceded at trial that appellant did, in fact, engage in sexual intercourse with Roslyn on the night in question. Thus, it was logical for the jury to conclude that Roslyn was beaten and strangled to facilitate sexual activity because when her body was discovered, her shorts were pulled down to her knees and her top was up to her breasts. As such, it was reasonable for the jury to infer that the individual who engaged in anal intercourse with Roslyn also beat, strangled, and undressed her to engage in the sexual conduct. Although appellant contends that David was the possible culprit, David was incapable of lifting more than fifty pounds due to his prior injuries. Dr. Germaniuk testified that the bruise to Roslyn's hip was consistent with having been dropped in the front seat of the vehicle. Based on this evidence, it would appear improbable that David could have lifted or dropped Roslyn because she weighed approximately one hundred twenty pounds. No credible evidence was introduced at trial to indicate that anyone other than appellant would have beaten, strangled, or raped Roslyn. Therefore, based on Schlee and Thompkins, supra, the jury did not clearly lose its way in convicting appellant of rape, and appellant's conviction should not be reversed because the evidence did not weigh heavily against the conviction. Thus, appellant's fourth assignment of error is without merit.
 {¶ 75} For the foregoing reasons, appellant's assignments of error are not well-taken. The judgment of the Trumbull County Court of Common Pleas is affirmed.
Diane V. Grendell, J., concurs.
Judith A. Christley, J., dissents with Dissenting Opinion.
[1] Appellant was simultaneously under investigation by the Warren City Police Department for the murders of two Warren residents, Esther Cook and her twelve-year old daughter, Ashley Cook. Appellant was ultimately arrested, indicted, and convicted of these two killings. His capital appeal for the Cook murders is presently pending before the Ohio Supreme Court in Case No. 01-2072.