OPINION
{¶ 1} Defendant-appellant, Craig Franklin, appeals from a Mahoning County Common Pleas Court judgment convicting him of complicity to commit murder and complicity to commit aggravated robbery following a jury trial.
 {¶ 2} This case concerns the robbery of Atway's Market in Youngstown, Ohio on May 21, 2005. On that day, appellant and Jermaine Beverly entered Atway's Market. Three others, Jamond Robinson, Christopher Garrett, and Eric Farmer, followed seconds behind them. When the second group of boys entered the store, they announced that they were robbing the store and appellant and Beverly then laid down on the floor. All of the boys were juveniles at the time.
 {¶ 3} According to Atway Atway (Atway), one of the owners of Atway's Market, two of the boys in the second group had guns. One of the boys put a gun in the face of Ghalib Atway (Ghalib), another of the owners, and pushed him into a candy rack. Atway then grabbed his own gun and fired two shots. One shot hit Robinson in the leg. The other shot hit Farmer. Farmer later died.
 {¶ 4} The three boys ran out of the store. Atway then put a toy gun to appellant's and Beverly's heads. He asked them if they were with the other three boys. Appellant and Beverly responded, "no." Atway then let them go.
 {¶ 5} Robinson and Beverly eventually confessed to the police. They both implicated appellant as the mastermind of the robbery.
 {¶ 6} A Mahoning County grand jury indicted appellant by direct presentment on October 6, 2005, charging him with one count of murder, a first-degree felony in violation of R.C. 2903.02(B)(D), and one count of aggravated robbery, a first-degree felony in violation of R.C. 2911.01(A)(1), both with accompanying firearm specifications.
 {¶ 7} The matter proceeded to trial on April 17, 2006. The jury found appellant guilty of complicity to commit murder and complicity to commit aggravated robbery and found him not guilty of the firearm specifications. The trial court subsequently sentenced appellant to 15 years to life on the complicity to commit murder count and ten years on the complicity to commit aggravated robbery count, to *Page 2 
be served consecutively.
 {¶ 8} Appellant filed a timely notice of appeal on May 18, 2006.
 {¶ 9} Appellant raises four assignments of error, the first of which states:
 {¶ 10} "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY PROHIBITING TRIAL COUNSEL FROM CROSS-EXAMINING APPELLEE'S WITNESS, JAMOND ROBINSON, RELATIVE TO HIS BIAS OR MOTIVE TO TESTIFY AGAINST APPELLANT CONSIDERING HIS CURRENT PLEA DEAL WITH APPELLEE."
 {¶ 11} At trial, plaintiff-appellee, the State of Ohio, called Jamond Robinson to testify. Robinson was one of appellant's co-defendants. Appellant's counsel wanted to question Robinson about his probation status in a rape case. (Tr. 344-47). He wished to question Robinson about whether Robinson had worked out a deal with the state whereby his probation would not be violated if he testified against appellant. (Tr. 346). But the court did not permit such questioning. (Tr. 344-47). The court noted that there was no probation violation hearing set and no motion had been filed to revoke Robinson's probation. (Tr. 347). The court stated that to allow appellant's counsel to question Robinson about the rape case would go to Robinson's character and not specifically to any bias Robinson might have in the present case. (Tr. 345).
 {¶ 12} Appellant argues that the trial court erred in not allowing his counsel to question Robinson about the rape case, Robinson's probation status, and Robinson's desire to keep the current charges against him in juvenile court. Appellant asserts that such questioning would have revealed Robinson's bias and improper motive for testifying against him.
 {¶ 13} The Sixth Amendment to the United States Constitution and the Ohio Rules of Evidence guarantee a criminal defendant the right to confront the witnesses against him for the biases they may hold.State v. Miller, 11th Dist. No. 2004-T-0082, 2005-Ohio-5283, at ¶ 32. And while cross-examination of a witness is a matter of right, the "`extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court.'" State v.Green (1993), *Page 3 66 Ohio St.3d 141, 147, 609 N.E.2d 1253, quoting Alford v.United States (1931), 282 U.S. 687, 691, 694, 51 S.Ct. 218, 75 L.Ed. 624. Hence, we will review the trial court's decision limiting the cross-examination of Robinson for an abuse of discretion. Abuse of discretion is more than a mere error of judgment; it is conduct that is arbitrary, capricious, unreasonable, or unconscionable. State v.Moreland (1990), 50 Ohio St.3d 58, 61, 552 N.E.2d 894.
 {¶ 14} Evid. R. 616(A) provides that a witness may be impeached by "[b]ias, prejudice, interest, or any motive to misrepresent." Thus, appellant was permitted to cross-examine Robinson regarding his motive for testifying and any bias he might have against appellant.
 {¶ 15} Appellee points us to a similar case from the Eighth District. In State v. Mitchell, 8th Dist. No. 88977, 2007-Ohio-6190, the defendant argued on appeal that the trial court erred in limiting his counsel's cross-examination of his co-defendant regarding her plea deal. The court relied on its previous decision in State v. Gresham, Eighth Dist. No. 81250, 2003-Ohio-744, where it reasoned:
 {¶ 16} "`While we agree that a plea bargain may provide a motive to misrepresent the facts, and therefore is a proper subject of cross-examination, cf. Evid. R. 616(A), the specific extent of the benefit the plea bargain provided to the witness is not relevant to this purpose. The fact that the witnesses agreed to plead guilty to lesser charges and to testify against appellant is sufficient to demonstrate the witness' potential motive to misrepresent the facts. A comparison of the potential penalties under the plea agreement versus the original charges does not add to this demonstration.'" Mitchell, at ¶ 60, quotingGresham, at ¶ 11.
 {¶ 17} The court then concluded that the trial court did not abuse its discretion in limiting the co-defendant's testimony. Id. at ¶ 61. It pointed out that defense counsel attempted to elicit the potential sentence the co-defendant would receive for her testimony. Id. And it noted that the co-defendant testified that she agreed to plead guilty to lesser charges in exchange for testifying against the defendant. Id. The court concluded that the testimony was sufficient to demonstrate the co-defendant's *Page 4 
potential bias. Id.
 {¶ 18} The same reasoning applies here. On cross-examination, Robinson testified that in exchange for his testimony against appellant, the state agreed to dismiss the murder charge and accompanying firearm specification against him. (Tr. 286-87, 291, 293). Along with dismissing the firearm specification, Robinson admitted that he was no longer facing the mandatory prison time that accompanied the specification. (Tr. 287). He also admitted that there was a question as to whether he might be able to keep the remaining charges against him in juvenile court rather than being bound over to common pleas court. (Tr. 288-89). Additionally, upon questioning by appellant's counsel, Robinson admitted that at first he lied to police about his involvement in the robbery. (Tr. 284-85). And he admitted that he was not going to testify in this case until he had a deal worked out. (Tr. 286).
 {¶ 19} Given Robinson's testimony on cross-examination, appellant's counsel clearly established that Robinson's motive for testifying in this case was to get the charges against him and possible penalties reduced. Appellant's counsel brought to the jury's attention that, in exchange for his testimony, the state dropped a murder charge and a firearm specification against Robinson. Counsel also brought to the jury's attention that if Robinson cooperated with the state, he might be able to remain in the juvenile court system instead of being bound over to the common pleas court. Counsel also brought to the jury's attention that Robinson initially lied to police about his involvement in the robbery. Thus, appellant amply cross-examined Robinson regarding his bias in this case and his motive for testifying.
 {¶ 20} Any further testimony on the subject would have been cumulative and highly prejudicial. Appellant's counsel wanted to bring up Robinson's rape case. The fact that Robinson was involved in a rape would have been highly prejudicial. Furthermore, as the trial court pointed out, no motion to revoke Robison's probation had been filed. Thus, any testimony on the subject would have been merely speculation. And most importantly, appellant's counsel had already plainly established that Robinson's motive for testifying in this case was to get a good deal *Page 5 
for himself.
 {¶ 21} Therefore, the trial court did not abuse its discretion in limiting counsel's cross-examination of Robinson. Accordingly, appellant's first assignment of error is without merit.
 {¶ 22} Appellant's second assignment of error states:
 {¶ 23} "THE TRIAL COURT DENIED APPELLANT DUE PROCESS UNDER THEFOURTEENTH AMENDMENT DUE TO THE FACT HIS CONVICTION FOR COMPLICITY TO MURDER AND AGGRAVATED ROBBERY WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE JURY'S VERDICT WAS INCONSISTENT WITH THE EVIDENCE AND TESTIMONY PRESENTED AT TRIAL."
 {¶ 24} Here, appellant argues that the jury's verdict was against the manifest weight of the evidence. Appellant contends that the only evidence in support of his conviction came from Robinson and another co-defendant, Jermaine Beverly, who both gave prior inconsistent statements and who were both offered plea deals for their testimony. Appellant asserts that the other evidence presented merely established that he was at Atway's Market when the robbery took place. He contends that his "mere presence" at the scene was not enough to prove that he was involved in the plan to rob Atway's Market.
 {¶ 25} In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Thompkins (1997),78 Ohio St.3d 380, 387, 678 N.E.2d 541. "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.'" Id. (Emphasis sic.) In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh *Page 6 
all of the evidence produced at trial. Id. at 390.
 {¶ 26} The jury convicted appellant of complicity to commit murder and complicity to commit aggravated robbery.
 {¶ 27} R.C. 2903.02(B) provides in pertinent part:
 {¶ 28} "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *."
 {¶ 29} R.C. 2911.01(A)(1) provides in relevant part:
 {¶ 30} "(A) No person, in attempting or committing a theft offense * * * or in fleeing immediately after the attempt or offense, shall do any of the following:
 {¶ 31} "(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it."
 {¶ 32} Because the jury convicted appellant of complicity by aiding or abetting, R.C. 2923.03(A)(2) also applies, which provides: "No person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense."
 {¶ 33} The evidence at trial revealed the following.
 {¶ 34} Robinson testified first. He stated that on the day of the robbery, he went to appellant's house. (Tr. 268). Robinson stated that he hung out there with appellant and Christopher Garrett and later Jermaine Beverly and Eric Farmer came over. (Tr. 269). Robinson stated that appellant then brought up the idea of a robbery. (Tr. 269). According to Robinson, appellant said "Let's hit a lick," which meant commit a robbery. (Tr. 270). Appellant told the others that they could rob the store where his mother cashed her checks on the north side of Youngstown. (Tr. 270). The group then got in Beverly's car and drove to the store on the north side. (Tr. 272).
 {¶ 35} Robinson stated that Beverly parked the car at an abandoned house and appellant went into the store alone to see who was there. (Tr. 272-73). He *Page 7 
testified appellant was in the store for a couple seconds and then came back to the group. (Tr. 273). Robinson stated that appellant reported that the two owners were in the store. (Tr. 273). He stated that appellant instructed the group what to do. (Tr. 274). According to Robinson, appellant said that he and Beverly were going to act as hostages. (Tr. 273-74). Farmer was to get the money. (Tr. 274). Robinson was to watch the door. (Tr. 274). And appellant, although it seems Robinson meant Garrett, was to hold the owner up with a gun. (Tr. 274).
 {¶ 36} Next, Robinson stated that appellant and Beverly went into the store. (Tr. 274). He stated that he and the others waited a couple of seconds and then followed them in. (Tr. 274). Robinson stated that he was dressed in all black with a do-rag on his head and a bandana around his neck. (Tr. 275). He stated that the others were dressed in black too and that Garrett also had a do-rag and a bandana. (Tr. 275). Robinson stated that Garrett picked up a gun and said "[everybody put their hands up, it's a robbery." (Tr. 275). Robinson stated that one of the men in the store grabbed Garrett's hand and the two started wrestling. (Tr. 276). Robinson pushed the man off of Garrett and the man fell into a candy stand. (Tr. 276). Next, Robinson heard a gunshot. (Tr. 276). He then ran out of the store. (Tr. 276-77). Robinson stated that appellant was in the store the entire time. (Tr. 277).
 {¶ 37} Robinson stated that he was shot in the leg. (Tr. 279). He went to Beeghly Medical Center for care. (Tr. 280). When asked by the Beeghly security guard what happened, Robinson lied and told the guard that he was at a robbery. (Tr. 280). Robinson stated that he was transferred to St. Elizabeth's Hospital. (Tr. 281). While there, the police came to question him. (Tr. 281). Initially, Robinson told the police the same lie he told to the security guard. (Tr. 281). The police then told him that Farmer had died. (Tr. 282). Robinson stated that after he learned of his friend's death, he told the police the truth of what happened because his friend had just died and he felt responsible for the death. (Tr. 282).
 {¶ 38} Robinson further testified that he told the police the truth and they then told him that they would tell the prosecutor that he cooperated and they would work a *Page 8 
deal out for him. (Tr. 283). Additionally, Robinson testified as to his plea deal and his motivation for testifying as set out in appellant's first assignment of error.
 {¶ 39} Next, Atway testified. He stated that on the day in question, he was working at the store with his brother Ghalib, who had brought his six-year-old grandson along with him. (Tr. 309). Atway stated that prior to the robbery, appellant came into the store alone and asked if Atway would cash his mother's check. (Tr. 309). Appellant told Atway that he was going to get his grandmother's slip to play her lottery numbers and then he left. (Tr. 309). Atway testified that he knew appellant and his family. (Tr. 310).
 {¶ 40} Atway testified that approximately 20 minutes later appellant returned with another guy. (Tr. 311). Atway stated that appellant placed 50 cents on the counter and asked for a juice. (Tr. 311). Atway testified that as soon as appellant put the money on the counter, the robbers barged in and put a gun in his face and in his brother's face. (Tr. 311). He stated that one of the robbers pushed Ghalib into a candy rack. (Tr. 311). Atway then grabbed his own gun and fired at the robber who had the gun on him and then fired at the robber who had the gun on his brother. (Tr. 311).
 {¶ 41} Atway stated that when the robbers barged in, appellant and the person he was with "went to the floor." (Tr. 312). After the robbers ran out, Atway put a fake gun to appellant's and the other boy's heads and asked if they were with the robbers. (Tr. 312). Atway stated that the two denied their involvement and he let them go. (Tr. 312). He also stated that the two were wearing "regular" clothes. (Tr. 314).
 {¶ 42} Ghalib testified next. He stated that he was fixing the chips and candy on a rack when someone came in the store wearing a mask and put a gun in his face. (Tr. 333). The person punched him in the chest and he fell into the candy rack. (Tr. 333-34). Ghalib stated that as he was trying to get up, he heard a gunshot. (Tr. 334). He stated that after he heard gunshots fired, everyone ran from the store. (Tr. 336). *Page 9 
 {¶ 43} Ghalib stated that he took the gun from his brother, went outside, and fired the gun into the air. (Tr. 336). He stated that this alerted the St. Elizabeth's Hospital Police, who came to his aid. (Tr. 336).
 {¶ 44} St. Elizabeth's Police Officer Robert Martin testified next. He stated that he heard gunshots. (Tr. 354). He then ran toward the shots when he noticed a man running from the area. (Tr. 354). Officer Martin chased the man and searched for him but did not locate him. (Tr. 355-56).
 {¶ 45} Next, St. Elizabeth's Police Officer Troy Fares testified. He stated that he was directed to the area by Officer Martin. (Tr. 362). He stated that he received information that one of the robbers was headed east up Lexington Avenue. (Tr. 364). He found a black male dressed in all black lying in the street at the intersection of Foster and Broadway. (Tr. 365). He stated that the person he found had been shot but was still alive at that time. (Tr. 365).
 {¶ 46} Co-defendant Beverly was the next to testify. He stated that on the day of the robbery, he and Farmer went to appellant's house. (Tr. 371). Beverly drove even though he was only 15 years old at the time. (Tr. 372). When Beverly and Farmer arrived, appellant, Garrett, and Robinson were already there. (Tr. 373). Beverly spent about ten minutes inside appellant's house and then went back out to his car with Farmer. (Tr. 374). Farmer then went back in the house while Beverly waited in the car. (Tr. 374-75). Farmer came back out to the car and told Beverly what the boys had talked about in the house. (Tr. 375). Based on this conversation, Beverly and Farmer waited in the car until appellant, Garrett, and Robinson came out and got in the car. (Tr. 375-76).
 {¶ 47} Once all five boys were in the car, appellant told Beverly he knew where to "hit a lick at." (Tr. 376). According to Beverly, appellant stated that they could rob Atway's Market on the north side where his mother cashed her checks. (Tr. 377). Beverly testified that appellant said he knew Atway's kept more than $500 in the store and that there would only be two people there without guns. (Tr. 377). Beverly stated that because he was from the south side of Youngstown, he did not *Page 10 
know how to get to Atway's. (Tr. 377). So appellant directed him which way to go. (Tr. 377).
 {¶ 48} Once the boys reached Atway's, Beverly parked the car at an abandoned house nearby. (Tr. 378). While the others waited in the car, appellant went into the store to see where the owner was. (Tr. 378). Beverly stated that when appellant returned to the car, he reported that there were only two old men in the store. (Tr. 379). Beverly stated that appellant told the group that he would go back in and the others were to follow and rob the store. (Tr. 379).
 {¶ 49} Beverly testified that he accompanied appellant back to the store. (Tr. 380). Before going in, Beverly stated that they stopped at a pay phone. (Tr. 380). He stated that appellant picked up the phone for five seconds, did not appear to talk to anyone, and then put the phone back down. (Tr. 380-81). The two then walked into the store. (Tr. 381). Beverly stated that they walked up to the counter and then Robinson, Garrett, and Farmer came in with rags on their faces and ordered everybody to lie down. (Tr. 382-83). He stated that he and appellant both laid down. (Tr. 383). Beverly stated that Garrett pushed one of the old men against a candy rack and the man fell. (Tr. 384). Beverly then heard gunshots. (Tr. 384). He testified that Robinson, Garrett, and Farmer all ran from the store. (Tr. 384). Beverly stated that he and appellant then got up off the ground. (Tr. 385). He stated that the old man behind the counter pointed a gun at him and asked Beverly if he was with the robbers. (Tr. 385). Beverly lied and told him "no." (Tr. 385). The man then let him go. (Tr. 385).
 {¶ 50} Afterwards, Beverly got back in his car with appellant and Garrett and the three went looking for Robinson. (Tr. 389). After a while, they gave up their search and went back to appellant's house. (Tr. 390).
 {¶ 51} Beverly further testified that when the police first questioned him about his involvement in the robbery, he lied. (Tr. 391-92). He stated that he later told the police the truth because he did not want to get caught up in lies and because his mother was with him and he did not want to lie in front of her. (Tr. 392). Beverly *Page 11 
stated that he had no idea if he was going to go to prison for this case. (Tr. 393). And on cross-examination, Beverly stated that he did not know what his plea deal was. (Tr. 401-406). But he admitted talking with prosecutors the day before the trial. (Tr. 402). And he admitted that they talked about what he was going to testify to. (Tr. 408-409).
 {¶ 52} Finally, Latonya White testified. She was on her way to Atway's Market when she noticed two boys standing by the pay phone in front of the store. (Tr. 416). She noticed that one of the boys put the phone to his ear but never put any money into the phone or dialed a number. (Tr. 416). White then saw three more boys walking down the street who appeared to be overdressed for the weather, i.e. wearing knit caps and scarves in the warm weather. (Tr. 417). She stated that the two boys by the phone entered the store and the other three followed them in. (Tr. 420, 424).
 {¶ 53} The jury's verdict is supported by the weight of the evidence. To support appellant's convictions for complicity, the evidence had to demonstrate that appellant supported, assisted, encouraged, cooperated with, advised, or incited the other boys in the commission of the crime, and that appellant shared their criminal intent. State v. Johnson
(2001), 93 Ohio St.3d 240, 754 N.E.2d 796, at the syllabus. His intent can be inferred from the circumstances surrounding the robbery. Id. Participation in criminal intent may be inferred from one's presence, companionship, and conduct before and after the offense is committed. Id. at 245, citing State v. Pruett (1971), 28 Ohio App.2d 29, 34,273 N.E.2d 884.
 {¶ 54} In this case, there was no question that a robbery took place at Atway's Market and that Farmer was shot and killed as a result. The jury was faced with determining whether appellant was involved in this robbery. This case hinged on whether the jury believed Robinson's and Beverly's testimony. Both were appellant's cohorts, both received plea deals in exchange for their testimony, and both initially denied their involvement in the robbery. Importantly, both testified that appellant was the mastermind behind the plan to rob Atway's Market. Robinson and Beverly *Page 12 
testified that appellant suggested to the group of boys that they could "hit a lick" at the store where his mother cashed her checks. They both testified that once the group arrived at the store, appellant went in to scope things out. And they both testified that appellant came up with the plan that he and Beverly would go in first. Furthermore, Beverly testified that appellant directed him how to get to Atway's Market. This evidence demonstrates that appellant shared the criminal intent of his cohorts.
 {¶ 55} Furthermore, Robinson's and Beverly's testimony corroborated each other. Both boys testified to substantially the same facts. And certain testimony given by other witnesses supported Robinson's and Beverly's testimony. Atway testified that on the day of the robbery, appellant first came into the store alone. Atway further stated that he frequently cashed appellant's mother's checks. And White testified that she saw the two boys at the pay phone outside of Atway's Market enter the store followed immediately by three other boys.
 {¶ 56} Although an appellate court is permitted to independently weigh witnesses' credibility when determining whether a conviction is against the manifest weight of the evidence, we must give great deference to the fact finder's determination of credibility. State v. Wright, 10th Dist. No. 03AP-470, 2004-Ohio-677, at ¶ 11. The policy underlying this presumption is that the trier of fact is in the best position to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing credibility. Id.
 {¶ 57} In this case, the jurors assessed Robinson's and Beverly's testimony and found them to be credible. The jurors found this in spite of the fact that the two boys had previously lied to police and received plea deals for their testimony. This was the jurors' prerogative. Because they listened to all of the testimony and observed the witnesses, they were in the best position to judge the witnesses' credibility. Therefore, we cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice. The verdict is supported by the weight of the evidence. *Page 13 
 {¶ 58} Accordingly, appellant's second assignment of error is without merit.
 {¶ 59} Appellant's third assignment of error states:
 {¶ 60} "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY OVERRULING HIS MOTION TO DETERMINE THE PROSECUTOR WAS USING HIS PEREMPTORY CHALLENGES TO EXCLUDE RACIAL MINORITIES BY EXCUSING THE AFRICAN-AMERICAN MEMBERS OF THE VENIRE PANEL IN VIOLATION OF THE SIXTH
AND FOURTEENTH AMENDMENTS] TO THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE 1 OF THE OHIO CONSTITUTION."
 {¶ 61} Appellant contends here that the prosecutor impermissibly used her peremptory challenges to excuse two potential African-American jurors on the jury venire. Appellant contends that the reasons the prosecutor gave for excusing the two potential jurors were merely pretextual.
 {¶ 62} A prosecutor violates the Equal Protection Clause of the United States Constitution when she uses peremptory challenges to purposefully exclude members of a minority group because of their race. Batson v.Kentucky (1986), 476 U.S. 79, 85-86, 106 S.Ct. 1712, 90 L.Ed.2d 69.
 {¶ 63} The Ohio Supreme Court has set out the steps for analyzing aBatson challenge as follows:
 {¶ 64} "First, the opponent of the peremptory strike must make a prima facie case of racial discrimination. Second, if the trial court finds that the opponent has fulfilled this requirement, then the proponent of the strike must come forward with a racially neutral explanation for the strike. The `explanation need not rise to the level justifying exercise of a challenge for cause.'
 {¶ 65} "Third, if the proponent puts forward a racially neutral explanation, the trial court must decide, on the basis of all the circumstances, whether the opponent has proved purposeful racial discrimination. The burden of persuasion is on the opponent of the strike." (Internal citations omitted.) State v. Herring,94 Ohio St.3d 246, 255-56, 762 N.E.2d 940, 2002-Ohio-796. *Page 14 
 {¶ 66} An appellate court will not reverse the trial court's decision that there was no discrimination unless it is clearly erroneous.State v. Hernandez (1992), 63 Ohio St.3d 577, 583, 589 N.E.2d 1310. Because these issues turn largely on evaluations of credibility, trial judges supervising voir dire are best equipped to resolve discrimination claims in jury selection. Hicks v. Westinghouse Materials Co. (1997),78 Ohio St.3d 95, 102, 676 N.E.2d 872, citing Batson, 476 U.S. at 98, fn. 21.
 {¶ 67} In this case, three African-American potential jurors were seated in the jury box during voir dire. (Tr. 225). The state used its first peremptory challenge to excuse Juror Wilkins, an African American. (Tr. 173, 225). Appellant's counsel then requested a side bar, which was held off the record. (Tr. 174). The state used its second peremptory challenge to excuse Juror Hanni, a Caucasian. (Tr. 187, 227). The state then used its third peremptory challenge to excuse Juror McCall, an African American. (Tr. 202). Again, appellant's counsel requested a side bar, which was also off the record. (Tr. 203). Finally, the state used its fourth peremptory challenge to excuse Juror Belak, a Caucasian. (Tr. 215, 229).
 {¶ 68} After the parties exhausted their peremptory challenges, the court held a discussion with counsel. The court noted that appellant's counsel had raised Batson challenges when the state used peremptory challenges to excuse two African-American potential jurors. (Tr. 223-24). It also noted for the record that appellant is African American. (Tr. 224). And the court noted that the jury included one African American, Juror Drayton. (Tr. 224).
 {¶ 69} The state then gave its reasons for excusing the two African Americans. As to Juror Wilkins, the prosecutor pointed out that Juror Wilkins' brother had been involved in the shooting of Ernie Biondillo, a man with alleged mob ties, and the shooting of the Mahoning County Prosecutor, Paul Gains. (Tr. 227). The prosecutor noted that Juror Wilkins stated that he was very close to his brother and followed the entire proceedings surrounding his brother's case. (Tr. 227). The prosecutor stated that the state had concerns that Juror Wilkins may have had more knowledge of those shootings and never came forward. (Tr. 227). Thus, the *Page 15 
prosecutor thought that Juror Wilkins might not be truthful and might not be able to be fair and impartial. (Tr. 227).
 {¶ 70} As to Juror McCall, the prosecutor noted that Juror McCall had not heard everything counsel had said during the general voir dire. (Tr. 228). He stated that this caused concerns that she might not pay attention to the entire jury trial and might only pick up bits and pieces. (Tr. 228). Additionally, the prosecutor pointed out that Juror McCall first indicated that the state would have to have proof "beyond all doubt." (Tr. 228). He noted that it was not until further prodding that she said, "Well, if it's proved beyond a reasonable doubt, I guess I could follow the law." (Tr. 228). But the prosecutor noted that Juror McCall was less than enthusiastic. (Tr. 228).
 {¶ 71} Additionally, it should be noted that about half-way through the trial, the trial court sua sponte dismissed Juror Drayton, the lone African-American juror, from the jury. (Tr. 342). The court did so because it was called to the court's attention that Juror Drayton was a former employee of the Juvenile Justice Center (JJC) and Juror Drayton failed to disclose this fact to the court or counsel even though it was a question on the jury questionnaire. (Tr. 342-43). The court pointed out that another prospective juror was an employee at the JJC and the court and counsel conducted an individual voir dire of him because the witnesses/co-defendants had juvenile records. (Tr. 343). Since Juror Drayton was not truthful about his employment at the JJC, the court and counsel were not able to question him concerning whether he knew any of the witnesses or codefendants and for that reason, the court excused Juror Drayton. (Tr. 343). At that time, appellant's counsel renewed hisBatson challenge. (Tr. 344). However, appellant's counsel noted that he was not challenging the court's removal of Juror Drayton, but was instead arguing that this situation made the presence of Juror McCall even more important. (Tr. 344).
 {¶ 72} Juror Wilkins' and Juror McCall's answers during voir dire support the prosecutor's reasons for their excusal.
 {¶ 73} Juror Wilkins stated that his brother was involved in the shootings of *Page 16 
Biondillo and Prosecutor Gains and that he followed the case "all the way through." (Tr. 162-63). He stated he was close with his brother. (Tr. 163). Juror Wilkins stated that his brother was convicted under the RICO Act and sentenced to 11 years in prison. (Tr. 164). He also acknowledged that Prosecutor Gains was the boss of the two prosecutors involved in this case. (Tr. 164). However, Juror Wilkins stated that he could still remain fair and impartial in this case. (Tr. 165).
 {¶ 74} Juror Wilkins' close involvement in the case surrounding the shooting of the Mahoning County Prosecutor and a man with alleged mob ties gave the prosecutor reason to believe that Juror Wilkins might harbor some resentment towards the state. Furthermore, the prosecutor seemed to believe that Juror Wilkins may have known more about his brother's case than he admitted to, and, for that reason, may have been untruthful.
 {¶ 75} As to Juror McCall, when questioned by the prosecutor regarding an example she had given earlier to the potential jurors, Juror McCall did not recall the example. (Tr. 192). Additionally, earlier during voir dire, the prosecutor spent considerable time discussing the reasonable doubt standard. (Tr. 91-99). When the prosecutor later questioned Juror McCall regarding the burden of proof the following exchange took place:
 {¶ 76} "MS. ARNAUT: Okay. Do you think reasonable doubt — do you think we have to prove our case by 100 percent beyond all doubt?
 {¶ 77} "MS. McCALL: Yeah, you're supposed to prove your case.
 {¶ 78} "MS. ARNAUT: But do you think everything is subject to some small doubt?
 {¶ 79} "MS. McCALL: Everything is.
 {¶ 80} "MS. ARNAUT: Everything is?
 {¶ 81} "MS. McCALL: Uh-huh.
 {¶ 82} "MS. ARNAUT: So are you going to hold us to a higher standard than that, knowing that everything is subject to some small doubt?
 {¶ 83} "MS. McCALL: Am I going to hold you to a higher standard? *Page 17 
 {¶ 84} "MS. ARNAUT: Yes.
 {¶ 85} "MS. McCALL: Yes, I guess.
 {¶ 86} "MS. ARNAUT: Okay. Even if the law says that we're not required to prove our case beyond all doubt?
 {¶ 87} "MS. McCALL: The law says that you are required to prove your case; doesn't it?
 {¶ 88} "MS. ARNAUT: Yes. Beyond a reasonable doubt, not beyond all doubt.
 {¶ 89} "MS. McCALL: Oh. Beyond a reasonable doubt?
 {¶ 90} "MS. ARNAUT: Yes."
 {¶ 91} Juror McCall then stated that she would be able to follow the law. (Tr. 192).
 {¶ 92} These statements by Juror McCall support the prosecutor's reasons for excusing her. It seems that Juror McCall did not pay attention to the discussion about the burden of proof or the prosecutor's examples. And it seems that Juror McCall may have given the prosecutor reason to believe that she would hold the state to a higher standard than proof beyond a reasonable doubt.
 {¶ 93} Regarding both Juror Wilkins and Juror McCall, the prosecutor gave valid, race-neutral explanations for their excusals. "The issue is the facial validity of the prosecutor's explanation; unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." State v. Betts, 8th Dist. No. 88607, 2007-Ohio-5533, at ¶ 65, citing Purkett v. Elem (1995),514 U.S. 765, 767-768, 115 S.Ct. 1769, 131 L.Ed.2d 834, quotingHernandez v. New York (1991), 500 U.S. 352, 111 S.Ct. 1859,114 L.Ed.2d 395. Furthermore, appellant was not able to demonstrate that these reasons were merely pretexts. Thus, the trial court's ruling on the issue was clearly erroneous.
 {¶ 94} Accordingly, appellant's third assignment of error is without merit.
 {¶ 95} Appellant's fourth assignment of error states:
 {¶ 96} "THE TRIAL COURT ERRED BY OVERRULING APPELLANT'S *Page 18 
MOTION TO DISMISS THE MURDER COUNT OF THE INDICTMENT SINCE A CRIMINAL DEFENDANT CANNOT BE HELD CRIMINALLY LIABLE FOR THE DEATH OF AN ACCOMPLICE UNDER THE FELONY MURDER RULE."
 {¶ 97} Appellant argues that in order to find him guilty of murder, the jury would have to find him guilty of aggravated robbery, and in order to find him guilty of aggravated robbery it would have to find that he had a firearm on his person or under his control and that he displayed, brandished, indicated he had, or used the firearm. Appellant points out that the jury found him not guilty of both firearm specifications. Thus, he argues that the jury's finding that he was guilty of murder and aggravated robbery are inconsistent with its finding of not guilty on the firearm specifications.
 {¶ 98} The jury found appellant guilty of complicity to commit aggravated robbery and complicity to commit murder. It also found him not guilty of the accompanying firearm specifications. However, these findings are not inconsistent.
 {¶ 99} The jury did not find appellant guilty as a principal. Instead, they found that appellant aided and abetted in the aggravated robbery. As stated above, appellant's complicity could be proven by a showing that he supported, assisted, encouraged, cooperated with, advised, or incited the other boys in the commission of the robbery, and that appellant shared their criminal intent. Johnson, 93 Ohio St.3d at the syllabus. Thus, the jury was not required to find that appellant was the person who displayed, brandished, or used a firearm. It could have found that one of appellant's cohorts displayed, brandished, or used a firearm in the commission of the robbery. The evidence clearly demonstrated that two of appellant's cohorts had guns and pointed them at Atway and Ghalib. Thus, the jury's verdict was not inconsistent.
 {¶ 100} Next, appellant argues that the trial court should have granted his motion to dismiss the murder count of the indictment. Appellant contends that he cannot be held criminally liable for Farmer's death because Farmer was shot and killed by the victim of the robbery that appellant alleges he was not involved in.
 {¶ 101} As discussed above, the evidence demonstrated that appellant was *Page 19 
involved in the robbery by way of aiding and abetting. Hence, appellant's argument that he was not involved in the robbery and, therefore, he cannot be guilty of the murder, is not convincing.
 {¶ 102} Appellant further asserts that it is unclear whether Ohio, in applying the felony-murder rule, follows the proximate cause theory. Additionally, he argues that the felony-murder rule does not apply when the murder victim was not "innocent."
 {¶ 103} On June 30, 1998, the Ohio Legislature amended the murder statute to include felony murder. Prior to that time, murder only involved purposeful killings. R.C. 2903.02(B), the felony-murder rule, now provides:
 {¶ 104} "No person shall cause the death of another as a proximateresult of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 [voluntary manslaughter] or 2903.04 [involuntary manslaughter] of the Revised Code." (Emphasis added.)
 {¶ 105} As appellee points out, there is no requirement in the felony-murder rule that the murder victim must have been innocent.
 {¶ 106} Both parties point to State v. Dixon, 2d Dist. No. 18582, 2002-Ohio-541, (abrogation recognized on other grounds), as being one of the few cases that addresses whether the proximate cause theory applies to the felony-murder rule. The facts of Dixon are nearly identical to the facts of this case. Dixon was convicted of felony murder for the death of his accomplice when he and his accomplice joined in an armed robbery, during the commission of which, the intended victim shot and killed the accomplice. On appeal, Dixon argued that he could not be held responsible for the death of his accomplice when the accomplice was killed by the intended victim of the robbery. The Second District examined the issue in detail:
 {¶ 107} "With respect to felony murder, two opposing theories of criminal responsibility exist. Under the `agency theory,' the State must prove that either the defendant or someone acting in concert with him, an accomplice, killed the victim *Page 20 
and that the killing occurred during the perpetration of and in furtherance of the underlying felony offense. Moore v. Wyrick (8th Cir., 1985), 766 F.2d 1253; State v. Chambers (1977), 53 Ohio App.2d 266, 56 ALR3d 239. Under the `proximate cause theory,' it is irrelevant whether the killer was the defendant, an accomplice, or some third party such as the victim of the underlying felony or a police officer. Neither does the guilt or innocence of the person killed matter. Defendant can be held criminally responsible for the killing regardless of the identity of the person killed or the identity of the person whose act directly caused the death, so long as the death is the `proximate result' of Defendant's conduct in committing the underlying felony offense; that is, a direct, natural, reasonably foreseeable consequence, as opposed to an extraordinary or surprising consequence, when viewed in the light of ordinary experience. Id; State v. Bumgardner (August 21, 1998), Greene App. No. 97-CA-103, unreported; State v. Lovelace (1999),137 Ohio App.3d 206, 738 N.E.2d 418.
 {¶ 108} "Reviewing the precise wording used in the felony murder statute at issue, R.C. 2903.02(B), that provision states that `no person shall cause the death of another as a proximate result of committing or attempting to commit an offense of violence that is a felony of the first or second degree. That wording clearly indicates an intent on the part of the Ohio legislature to adopt a proximate cause standard of criminal liability.
 {¶ 109} "In State v. Chambers, supra, the Court of Appeals reviewed the involuntary manslaughter statute, R.C. 2903.04(A), the operative language of which is virtually identical to R.C. 2903.02(B) with respect to causation: `no person shall cause the death of another . . . as aproximate result of committing or attempting to commit a felony. Upon facts nearly identical to those in the case before us, where defendant's accomplice was shot and killed by the victim of the underlying felony offense while resisting that crime, the Court of Appeals inChambers concluded that defendant could be held criminally liable for involuntary manslaughter for the death of his accomplice. TheChambers Court reasoned that the Ohio legislature had manifested its intent, through the precise language used in the involuntary *Page 21 
manslaughter statute, to follow the proximate cause theory, rather than agency, as the basis for criminal responsibility.
 {¶ 110} "We conclude that the proper interpretation of the felony murder statute at issue in this case compels the same result as that reached in Chambers, because R.C. 2903.02(B) employs the exact same causation language, which demonstrates the legislature's intent to adopt proximate cause as the standard of criminal responsibility for R.C. 2903.02(B)." (Emphasis sic.) Id.
 {¶ 111} This court has previously approved of Dixon's conclusion that it is irrelevant, under the felony-murder rule, whether the killer is the defendant, an accomplice, or a third party such as the victim.State v. Kimble, 7th Dist. No. 06-MA-190, 2008-Ohio-1539, at ¶ 35-37. We also cited to Dixon's statement that the guilt or innocence of the person killed is likewise irrelevant. Id.
 {¶ 112} The Eighth District has also approved of Dixon's reasoning, holding that a defendant may be held criminally liable for the unintended death that results from the commission of a first-or second-degree felony. See State v. Muntaser, 8th Dist. No. 81915,2003-Ohio-5809, at ¶ 26-27. And in State v. Ervin, 8th Dist. No. 87333,2006-Ohio-4498, the Eighth District analyzed another felony-murder situation where the murder victim was a kidnapped FBI informant and an FBI special agent accidentally shot and killed the informant during a confrontation with the kidnappers. The court applied the "proximate result of" test and Dixon's reasoning:
 {¶ 113} "In this case, the evidence revealed that there was more than one cause of Lester's death. The intervening act of SA Werth shooting at the driver of the vehicle was the most immediate and obvious cause of Lester's death, but not the sole and exclusive cause. Had Ervin and Waller not kidnapped Lester and demanded a sum of money or drugs for his return, Lester would not have been shot. Had Ervin surrendered at the scheduled drop-off when the FBI SWAT team converged on his vehicle and had Ervin not driven his vehicle at SA Werth, Lester, the front-seat passenger, would not have been shot and killed. By kidnapping Lester, attempting to avoid apprehension, and driving at SA Werth, Ervin and Waller *Page 22 
set in motion a chain of events in which one of the reasonably foreseeable consequences was the death of Lester. Thus, Ervin and Waller's conduct was a proximate cause of Lester's death for which Ervin is criminally responsible." Id. at ¶ 25.
 {¶ 114} Dixon's reasoning is persuasive. The legislature specifically chose to use the words "as a proximate result of" in writing the felony-murder statute. By doing so, it is reasonable to conclude that the legislature specifically intended to include any situation where someone is murdered "as a proximate result of" an offender committing or attempting to commit an offense of violence that is a first-or second-degree felony.
 {¶ 115} Additionally the Eleventh District, while not addressing facts similar to those here, has nonetheless applied the "proximate result of" theory to the felony-murder rule in Ohio. For instance in State v.Adams, 11th Dist. No. 2000-T-0149, 2004-Ohio-3510, the court held that the evidence was sufficient to support a finding that the defendant caused the victim's death as a "proximate result of" his commission of the offense of rape as required to establish felony murder. In that case, the evidence demonstrated that the defendant beat, strangled, and raped the victim and then left her unconscious in a car. The car subsequently caught on fire. The victim's immediate cause of death was carbon monoxide intoxication. On appeal, the defendant argued that even if he beat, strangled, and raped the victim and left her in the car, he could not have foreseen that the vehicle would unexplainably burst into flames.
 {¶ 116} The Eleventh District discussed "proximate result" as used in the felony-murder statute:
 {¶ 117} "`" * * *[P]roximate result" bears a resemblance to the concept of "proximate cause" in that (a) defendant will be held responsible for those foreseeable consequences which are known to be, or should be known to be, within the scope of the risk created by his conduct. (* * *) Here, that means that death reasonably could be anticipated by an ordinarily prudent person as likely to result under these or *Page 23 
similar circumstances. (* * *)." (Citations omitted.)' State v.Gibson (June 27, 1997), 11th Dist. No. 95-P-0125, 1997 Ohio App. LEXIS 2898, at 12-13, quoting State v. Losey (1985), 23 Ohio App.3d 93, 95,491 N.E.2d 379." Id. at ¶ 65.
 {¶ 118} The court then reasoned that carbon monoxide intoxication, which was the immediate cause of death, was a proximate result of the victim being left alone, incapacitated, and without medical attention. Id. at ¶ 69. The court concluded that "an ordinarily prudent person could anticipate that death was a foreseeable consequence." Id.
 {¶ 119} And the Tenth District, in applying the "proximate result of" test, has stated:
 {¶ 120} "In order for a criminal defendant's conduct to be the proximate cause of a fatal result in a felony murder case, the court must first determine whether the killings would not have occurred `but for' the defendant's conduct. The court must then determine whether the result varied greatly from the intended outcome or foreseeable result of the underlying crime, that is, `that the result achieved was not so extraordinary or surprising that it would be simply unfair to hold the defendant criminally responsible for something so unforeseeable.'State v. Dixon, Montgomery App. No. 18582, 2002-Ohio-541, citing LaFave Scott, Criminal Law (1972), Section 35, 246. Foreseeability should be assessed from the viewpoint of what the defendant knew or should have known in light of ordinary experience. State v. Lovelace (1999),137 Ohio App.3d 206, 216." State v. Franklin, 10th Dist. No. 06AP-1154,2008-Ohio-462, at ¶ 25.
 {¶ 121} We too will apply the "proximate result of" test in determining whether appellant's conviction for felony murder was proper.
 {¶ 122} In this case, had appellant and his accomplices not attempted to rob Atway's by holding up the owners at gunpoint, Farmer would not have been killed. Thus, but for the robbery, Farmer would still be alive. It should have been reasonably foreseeable to appellant and his cohorts that if they perpetrated an armed robbery using multiple firearms to hold up the store owners, the owners were *Page 24 
likely to attempt to defend themselves and their store, also with the use of firearms. It likewise should have been foreseeable that someone, either one of the robbers or one of the store owners, would be shot and killed in such a robbery. Thus, Farmer was murdered as a proximate result of the robbery of Atway's Market.
 {¶ 123} Finally, appellant contends that he cannot be complicit in Farmer's death because there is no principal offender. However, the complicity statute specifically states that it is no defense to a complicity charge that nobody with whom the accused was in complicity has been convicted as a principal offender. R.C. 2923.02(B).
 {¶ 124} Accordingly, appellant's fourth assignment of error is without merit.
 {¶ 125} For the reasons stated above, the trial court's judgment is hereby affirmed.
Vukovich, J., concurs.
 Waite, J., concurs. *Page 1